Michael Louis BRENNAN,
Plaintiff–Appellant,

v.

Paul KING, et al., Defendants–Appellees.

No. 97–1126.

United States Court of Appeals,
First Circuit.

Heard July 30, 1997.

Decided March 20, 1998.

Edward Greer, Brookline, MA, was on brief, for appellant.

Marc Redlich, with whom Steven T. Sager, Merle Ruth Hass and Law Offices of Marc Redlich, Boston, MA, were on brief, for appellees.

Before BOUDIN, Circuit Judge, HILL,[*] Senior Circuit Judge, and POLLAK,[**] Senior District Judge.

POLLAK, District Judge.

This case involves the extent of an employee's obligation to pursue contractual grievance procedures prior to—or in lieu of—bringing suit. Plaintiff-appellant Michael Louis Brennan, a faculty member at Northeastern University, brought suit in federal court in Massachusetts against Northeastern, its trustees, president, and provost, the dean of Northeastern's College of Engineering, and the acting chair of the university's Department of Industrial Engineering and Information Systems. Brennan alleged, *inter alia*, that defendants violated federal and state anti-discrimination laws and breached his contract of employment with Northeastern. More specifically, Brennan contended that, as a tenure-track assistant professor, he was eligible for promotion to tenure rank but was denied tenure because he was gay and HIV-positive.

The district court granted defendants' motion for summary judgment on the ground that Brennan had failed to pursue the grievance procedure governing adverse tenure decisions which was set out in the employee handbook and thereby incorporated into Brennan's employment contract. Brennan then brought this appeal. Brennan acknowledges that he did not invoke the specified grievance procedure, but he argues that the grievance procedure he bypassed was not a remedy he was bound to invoke before pre-

---

[*] Of the Eleventh Circuit, sitting by designation.

[**] Of the Eastern District of Pennsylvania, sitting by designation.

senting his claims to a federal court. With respect to Brennan's federal claims and the bulk of his state claims, we agree and, accordingly, reverse in part. With respect to Brennan's claims of breach of contract, we hold that Massachusetts law required resort to contractual remedies before suit. We will therefore affirm on that issue.

## I. Facts

The principal facts relevant to this appeal are not in dispute. In 1988, appellant Brennan joined the Northeastern faculty as a tenure-track assistant professor of industrial engineering. During the 1993–94 academic year, he applied for tenure and was turned down. Because the university has a policy that limits non-tenured assistant professors to six years of employment, Brennan was given a final contract for the 1994–95 academic year, after which his employment was terminated. Brennan's employment contract for 1993–94 expressly incorporated the terms of the Northeastern University Faculty Handbook for that year. The handbook sets out (1) a general grievance procedure, which includes the possibility of "binding arbitration," and (2) a separate grievance procedure, governing tenure appeals, which includes a form of arbitration characterized as "binding" but of limited scope.

### A. Northeastern's Tenure Review and Appeals Procedures Tenure Review

Tenure review at Northeastern is a multistep process ultimately leading to a decision by the board of trustees. Initially, the candidate's record is reviewed by at least three tenured members of his or her department. This review leads to a departmental recommendation that is transmitted to the dean of the college. The dean, in turn, makes a recommendation to the provost of the university. The provost then makes a recommendation to the university president. In the last stage of the process, the president makes a recommendation to the board of trustees, and the board then makes a final decision. At no stage of the procedure is the recommendation of any evaluator binding upon the evaluator or decision-maker at the next stage.

*Tenure Appeals.* The tenure appeals process is made available following a decision by the provost to recommend to the president that the candidate's tenure application be denied.

The precise course of the tenure appeals process varies depending on whether the appellant makes a claim of, or including, "discriminatory acts" in connection with an adverse tenure recommendation. If a tenure candidate's appeal does not involve a "formal claim of discriminatory acts," the candidate must bring his or her appeal before the University Standing Appeals Committee on Tenure ("the Appeals Committee" or "Committee") within five days after the candidate learns of the provost's adverse decision. The Appeals Committee is composed of tenured faculty members from various schools of the university. Upon concluding its inquiry, the Committee makes a recommendation to the provost. If the Committee recommends in favor of the candidate, but the provost continues to maintain that tenure should be denied, the handbook authorizes the candidate "to submit procedural issues to binding arbitration" within ten days of learning of the provost's decision to proceed with the negative recommendation. The handbook specifies that "[t]he decision of the arbitrator, within the scope of his or her jurisdiction, shall be final and binding on the parties to the dispute and the University; however, the arbitrator shall be without power to ... (3) substitute his or her judgment on the professional qualification of a faculty member for the judgment of any academic committee or official, or (4) engage in a comparative review of the candidate's merits with those of other candidates, or (5) grant or deny tenure."

If the arbitrator "is convinced that the Provost's decision is not reasonably supported by the record," the arbitrator can require the provost to transmit to the president the Appeals Committee's positive recommendation instead of the provost's negative one. As with all tenure evaluations received from the provost, the president is not bound by such a recommendation.[1]

Although the foregoing procedures generally govern the Appeals Committee's consid-

**1.** Section 3.d of the tenure appeal procedure provides, in part:

eration of a tenure decision, the handbook provides a candidate with a different initial procedural route if his or her appeal presents, or includes, issues of discrimination. The manual instructs that a tenure candidate who believes that he or she has been subject to discrimination "should consult with" the university's Office of Affirmative Action ("OAA"). In the event that a candidate institutes a tenure appeal, and the appeal involves "formal claim[s] of discriminatory acts," the handbook directs that the candidate present those claims to the OAA before the candidate's case will be considered by the Appeals Committee. The Appeals Committee will stay any issues not involving discrimination while the OAA conducts an investigation and makes findings. If the OAA finds "Reasonable Cause"—that is, facts supporting the claim of discrimination—it will transmit this finding to the Appeals Committee, which will then consider the appeal. (What weight this finding is to be given by the Appeals Committee is left entirely unclear). If, on the other hand, the OAA does not find "Reasonable Cause," the Appeals Committee is to dismiss the discrimination issues and proceed to examine issues that do not relate to discrimination (if any).[2] Thus, so long as any issues remain after the OAA makes its finding, the appeals process runs its course whether that finding is one of "Reasonable Cause" or not; as explained above, the appeals process includes the candidate's option to request arbitration if: (1) the Appeals Committee makes a recommendation favorable to the candidate, and (2) the provost nonetheless states an intention to adhere to the original unfavorable recommendation.

### B. The Course of Events in Brennan's Case

Although Brennan received positive recommendations at the departmental and deca-

2) If the Provost recommends against tenure although the Appeals Committee has recommended that tenure be granted, s/he shall communicate this to the candidate before sending the recommendations of the Committee and of the Provost to the President. Only in this event does the candidate have the right to submit procedural issues to binding arbitration. If arbitration goes forward, the recommendations of the Provost and of the Committee shall not be transmitted to the President prior to the outcome of the arbitration proceedings.

a) A request by the candidate for arbitration must be presented in writing to the Provost (or his/her designee) within ten calendar days of the date of the Provost's written communication of his/her negative recommendation in opposition to a positive Appeals Committee recommendation....

b) The arbitrator shall be chosen from a list of arbitrators maintained by the American Arbitration Association. The arbitrator must be qualified for academic arbitration by virtue of current or previous service as a faculty member or academic administrator of a college or university. The conduct of the proceedings shall be governed by the rules of the American Arbitration Association.

c) The decision of the arbitrator, within the scope of his or her jurisdiction, shall be final and binding on the parties to the dispute and the University; however, the arbitrator shall be without power to ... ·

(3) substitute his or her judgment on the professional qualification of a faculty member for the judgment of any academic committee or official, or

(4) engage in a comparative review of the candidate's merits with those of other candidates, or

(5) grant or deny tenure.

If, however, in the adjudication of the case, the arbitrator is convinced that the Provost's decision is not reasonably supported by the record, he or she may bind the Provost to transmit, to the President, the Standing Appeals Committee's positive recommendation in lieu of the Provost's own.

2. The handbook states:

Any formal claim of discriminatory acts prohibited by law or University policy shall be pursued and investigated through the Office of Affirmative Action rather than before the Committee. A candidate should consult with the Office of Affirmative Action at any time s/he becomes aware of prohibited discrimination. The internal review and action with respect to discrimination claims will be completed before a tenure recommendation is transmitted to the President and the Board of Trustees.... If an appeal is instituted, the consideration of non-discrimination related appeal issues will be stayed until the Affirmative Action Office has rendered a decision as to whether sufficient facts exist (defined as Reasonable Cause) to suggest that the asserted discrimination did occur. This finding shall be added to the dossier and considered by the Appeals Committee which will then consider the case. If reasonable cause is not found by the Affirmative Action Office, the discrimination issue will be dismissed from the Appeals Committee consideration and the non-discrimination based appeal issues will be considered as described below.

nal levels of review, the provost informed Brennan that he intended to recommend against the granting of tenure. Brennan, apparently on the advice of counsel, eschewed the university's tenure appeal process altogether. That is to say, Brennan did not present his case to the Office of Affirmative Action or to the Appeals Committee. (Not having sought Appeals Committee review, Brennan could not have elected to present his case to arbitration had he wished to do so). Accordingly, the provost transmitted his negative recommendation to the president. The president in turn submitted a negative recommendation to the board of trustees, and that body made the final decision to deny tenure.

Having been turned down at the highest level of university decision-making, Brennan filed complaints with the Massachusetts Commission Against Discrimination ("MCAD") and the federal Equal Employment Opportunity Commission ("EEOC"). The MCAD issued a "Lack of Probable Cause Finding," a decision that it affirmed on administrative appeal. The EEOC also found no violation, and issued a right-to-sue letter.

Brennan then commenced this suit in the District Court for the District of Massachusetts, alleging violation of the Americans with Disabilities Act (ADA), 42 U.S.C. § 12101 *et seq.*, and the Rehabilitation Act of 1973, 29 U.S.C. § 794 *et seq.*, as well as several state-law claims, including breach of contract and violation of anti-discrimination provisions of the Massachusetts Constitution and Massachusetts statutes.[3] The parties agree that all of Brennan's claims stem from his contention that he was denied tenure because of his sexual orientation and his HIV-positive status.

Northeastern and its officials moved for dismissal or summary judgment on the ground that Brennan had failed to pursue the grievance procedure specified in his employment contract. The district court entered summary judgment in favor of the university and its fellow defendants, giving particular

weight to the "[f]ederal policy favor[ing] arbitration agreements." Memorandum and Order on Defendant's Motion to Dismiss, Brennan v. King, No. 96–11526, at 2 (D.Mass. Dec. 13, 1996). "[P]laintiff's contract," the court held, "clearly commits tenure disputes to the University's grievance and arbitration process." *Id.*

The district court had federal question jurisdiction by virtue of appellant's ADA and Rehabilitation Act claims. 28 U.S.C. § 1331. The district court also had supplemental jurisdiction over appellant's state-law claims because they arise from the same operative facts. 28 U.S.C. § 1367(a). Because this is an appeal from entry of summary judgment, our review is *de novo*. To the extent that any factual issues remain, we must resolve all such questions in the way most favorable to the non-moving party. *See Byrd v. Ronayne*, 61 F.3d 1026, 1030 (1st Cir.1995).

## II. Discussion

In bringing this lawsuit, Brennan has undertaken to place in issue the question whether Northeastern University was justified in denying him tenure, or whether, as Brennan asserts, the denial of tenure was based upon unacceptable grounds—namely that Brennan was gay and HIV-positive. But the district court, in granting summary judgment in favor of the appellees, did not address the merits of Brennan's claims. Rather, the district court concluded that Brennan was barred from coming to court because he had not traveled the entire path of the grievance procedure which, pursuant to Brennan's contract of employment with Northeastern, was available to him. In particular, the district court, noting the strong federal policy favoring arbitration, faulted Brennan for pretermitting the arbitration aspect of the grievance procedure.

Brennan contends that the district court erred in its ruling on the arbitration issue. Brennan also argues that appellees have waived their arbitration defenses by not raising them in the EEOC and MCAD proceed-

---

**3.** Mass. Const. art. 114; Mass. Gen. Laws ch. 93, § 103(a); Mass. Gen. Laws ch. 151B, § 4(1), (16). Brennan also alleged fraud, misrepresenta-

tion, intentional and/or negligent infliction of emotional distress, and civil conspiracy.

ings. For their part, appellees urge what appear to be two distinct grounds in support of affirmance: (1) both federal and state arbitration law required that Brennan arbitrate his claims, and (2) some species of exhaustion doctrine required that Brennan utilize the university's grievance process before resorting to court.

We first address Brennan's waiver arguments. We then consider the principal questions in this case—whether the Federal Arbitration Act, or its Massachusetts counterpart, or exhaustion doctrine more broadly construed—required Brennan to pursue the grievance procedure, including arbitration, described in his contract of employment. Finally, we turn to the question whether Brennan was required by Massachusetts common law to pursue the contractual grievance procedure before suing for breach of contract.

### A. Waiver

■ As a preliminary matter, we address Brennan's argument that appellees waived their arbitration defenses because appellees failed to raise them in the administrative proceedings before the EEOC and the MCAD. The district court rejected this argument, finding that "the University counsel's ... letter to the MCAD ... discusses this failure at great length." Memorandum and Order on Defendant's Motion to Dismiss, at 2 n. 2. In fact, the university's letter to the MCAD does mention, in at least two places, the fact that Brennan did not exhaust the university's grievance procedure prior to presenting his claim to the MCAD.[4] Brennan, however, urges that appellees' mere mention of the fact that he had not exhausted the procedure does not amount to raising the issue as a defense, and that it is the failure to raise the defense that constitutes waiver in this case. Brennan contends that, having failed to characterize the issue as a matter of defense at the administrative agency level, appellees have forfeited their entitlement to raise the issue before the district court.

It is, of course, true that a court charged with reviewing determinations of another tribunal will not ordinarily consider issues not raised in the earlier proceedings. But that truism is without application here since it was no part of the responsibility of the district court to review the determinations of the EEOC or the MCAD. Nor was it appellees' responsibility to raise arbitration as a defense in the administrative proceedings. Appellees' arbitration arguments do not constitute relevant defenses before the EEOC. As the Supreme Court recently noted, "An individual ... claimant subject to an arbitration agreement will still be free to file a charge with the EEOC, even though the claimant is not able to institute a private judicial action." *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 28, 111 S.Ct. 1647, 1653, 114 L.Ed.2d 26 (1991). We see no reason to suppose that the Massachusetts courts would treat Brennan's state-law discrimination claims differently. Therefore, we do not find that appellees waived their arbitration defenses by their failure—if failure there was—to raise before either of the administrative agencies contentions that would not have been pertinent defenses in such a forum.

Nor can it be said that appellees have advertently chosen to withhold their arbitration defenses during litigation in such a way that Brennan is prejudiced by the delay. We have found arbitration defenses waived when a party sought to take advantage of an arbitration clause by raising the issue as a defense late in the litigation. *See, e.g., Menorah Ins. Co. v. INX Reinsurance Corp.*, 72 F.3d 218, 221 (1st Cir.1995)(finding waiver where arbitration was raised as defense to suit after a year of litigation); *Caribbean Insurance Services, Inc. v. American Bankers Life Assurance Co.*, 715 F.2d 17, 19 (1st Cir.1983) (finding waiver where party asserted arbitration as defense six months after being sued); *Jones Motor Co. v. Chauffeurs, Teamsters and Helpers Local Union No.*

---

4. The university's letter to the MCAD noted that "Dr. Brennan had an opportunity to have his case reviewed by an Appeals committee, consisting of 13 members of the faculty and, unlike other colleagues who pursued this remedy, withdrew his appeal on the grounds that the University procedures 'have proven to be a sham.'" (app., at 130). The university's letter also stated that "[a]t no point did Dr. Brennan ever claim discrimination of any type in Provost Baer's recommendation, nor did he file a complaint with the Office of Affirmative Action."

*633*, 671 F.2d 38, 43 (1st Cir.) ("[T]o require that parties go to arbitration despite their having advanced so far in court proceedings before seeking arbitration would often be unfair, for it would effectively allow a party sensing an adverse court decision a second chance in another forum."), *cert. denied,* 459 U.S. 943, 103 S.Ct. 257, 74 L.Ed.2d 200 (1982). Appellees in this case, however, promptly raised their defenses in the district court, and it is to judicial, rather than administrative, proceedings that we·look to determine whether such waiver has occurred. *See Sevinor v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 807 F.2d 16, 18 (1st Cir.1986) (finding no waiver where defendants promptly raised arbitration as a defense to a suit). Accordingly, the district court did not err by considering the arbitration arguments advanced by Northeastern and its officials, and we therefore will entertain those arguments.

### B. Enforceability of the Handbook's Arbitration Provision

We first consider whether the Federal Arbitration Act (FAA) obligated Brennan to arbitrate his claims against Northeastern. As we have had occasion to observe, "a party seeking to substitute an arbitral forum for a judicial forum must show, at a bare minimum, that the protagonists have agreed to arbitrate some claims." *McCarthy v. Azure,* 22 F.3d 351, 354–55 (1st Cir.1994). This much appellees have shown. The university's faculty handbook describes a "regular grievance procedure" committing issues other than tenure decisions to binding arbitration and a separate process for submitting to binding arbitration "procedural issues" relating to tenure review. Therefore, we apply FAA principles to this dispute.[5]

Having determined that the FAA is here implicated, we consider whether the dispute between Brennan and Northeastern that is the focus of this lawsuit is the sort of dispute that the parties agreed to arbitrate. Although this is fundamentally an issue of contract interpretation—for which state law provides the basic interpretive rules—our inquiry is informed by FAA jurisprudence. In FAA cases, Supreme Court precedents "instruct courts to use a particular hermeneutic principle for interpreting the breadth of the agreement," viz., the presumption of arbitrability. *McCarthy,* 22 F.3d at 355. This presumption dictates that "as a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or a like defense to arbitrability." *Moses H. Cone Memorial Hospital v. Mercury Construction Corp.,* 460 U.S. 1, 24–25, 103 S.Ct. 927, 941, 74 L.Ed.2d 765 (1983). Accordingly, "in applying general state-law principles of contract interpretation to the interpretation of an arbitration agreement within the scope of the Act, due regard must be given to the federal policy favoring arbitration, and ambiguities as to the scope of the arbitration clause itself resolved in favor of arbitration." *Volt Information Sciences, Inc. v. Leland Stanford Junior University,* 489 U.S. 468, 475–76, 109 S.Ct. 1248, 1254, 103 L.Ed.2d 488 (1989) (citation omitted).

The presumption of arbitrability is a weighty additive to state-law principles of contract construction, but it does not wholly supplant these principles. As with other issues involving the construction of individual employment contracts, in determining whether a contract requires arbitration, "courts generally . . . should apply ordinary state-law principles that govern the formation of contracts." *First Options of Chicago, Inc. v. Kaplan,* 514 U.S. 938, 944, 115 S.Ct. 1920,

---

5. The Federal Arbitration Act, 9 U.S.C. § 1, excludes from its scope "contracts of employment of seamen, railroad employees, or any other class of workers engaged in foreign or interstate commerce." 9 U.S.C. § 1. Although the Supreme Court has not determined the scope of this exclusion—*see Gilmer v. Interstate/Johnson Lane Corp.,* 500 U.S. 20, 25 n. 2, 111 S.Ct. 1647, 1651 n. 2, 114 L.Ed.2d 26 (1991)(reserving the question)—most circuits, including this one, have held that the exclusion is confined to workers who are engaged in the transportation of goods in interstate commerce. *Dickstein v. duPont,* 443 F.2d 783, 785 (1st Cir.1971) (finding the exception applicable only to "employees . . . involved in, or closely related to, the actual movement of goods in interstate commerce"). Since Brennan's employment did not involve interstate commerce in this narrow sense, the exclusion does not apply to Brennan's contract with Northeastern.

1924, 131 L.Ed.2d 985 (1995). At bottom, arbitration remains "simply a matter of contract between the parties; it is a way to resolve those disputes—but only those disputes—that the parties have agreed to submit to arbitration." *Id.* at 943, 115 S.Ct. at 1924.

We turn, therefore, to the application of these principles. As the parties agree, Brennan's claims, though they are expressed as manifold causes of action, all concern the university's denial of tenure to Brennan. We therefore look to the contract to determine whether the parties have agreed to submit tenure decisions to arbitration, resolving any doubts arising from this interpretive enterprise in favor of arbitration.

As we have previously noted, Brennan's contract with Northeastern contains two arbitration provisions. For non-tenure related grievances, the handbook establishes a grievance system potentially culminating in binding arbitration. This general grievance scheme contemplates a comparatively broad arbitral authority for the resolution of faculty complaints of unfair or inequitable treatment or of misapplication of the handbook or other governing documents or regulations.[6]

The grievance procedure with respect to tenure disputes is wholly separate and evinces no broad arbitral authority to resolve such disputes. The handbook does allow for a proceeding within the tenure consideration process labeled "binding arbitration." But it is readily apparent that such arbitration as the handbook contemplates could not have resolved Brennan's dispute with the university. To be sure, the handbook recites that an arbitral decision "shall be final and binding on the parties to the dispute and the University." But the *scope* of what is subject to arbitration is limited to "procedural issues." Although it is not at all clear what is embraced under the rubric of "procedural issues," it is abundantly clear that among those things that the arbitrator is "without power to" do is to "grant or deny tenure." Evidently the arbitrator is confined to addressing non-substantive issues that may—but also may not—have some impact on the tenure decision ultimately made by the university's trustees.

Furthermore, to the extent that the arbitrator can be said to have authority to "bind" the parties, including the university, with respect to "procedural issues," the narrowness of that authority is plain to see. In what would be, for the university, the worst-case scenario—one in which the arbitrator "is convinced that the Provost's decision [to transmit to the president a negative tenure recommendation notwithstanding the Appeals Committee's positive recommendation] is not reasonably supported by the record," all the arbitrator is empowered to do is require the "Provost to transmit, to the President, the Standing Appeals Committee's positive recommendation in lieu of the Provost's

---

**6.** Section I.D of the handbook, entitled "Faculty Grievance Procedure," describes a somewhat elaborate procedure governing grievances between faculty members and the university (other than tenure-related disputes). The handbook defines a grievance as a "complaint by a faculty member that he or she: 1) has been subject to a violation, misinterpretation or inequitable application of the Faculty Handbook, Academic Operations Manual, or other published University or unit regulations; or 2) has otherwise been treated unfairly or inequitably." The handbook provides a multi-step process for resolving such complaints. The grievant is encouraged to seek informal resolution. A formal grievance must, however, be filed within three months "after the faculty member became aware of the grievable event." The grievant may elect to secure "early provostial review" or may invoke the general procedure, which contemplates "mediation by an *ad hoc* Faculty Committee." Should the grievant be dissatisfied with the *ad hoc* committee's dispo-

sition, he or she may request arbitration. However, the grievant is only entitled to arbitrate the grievance if the *ad hoc* faculty mediation committee decides that the grievance should be arbitrated. With respect to the arbitrator's authority, the handbook provides:

> The decision of the arbitrator, within the scope of his or her jurisdiction, shall be final and binding on the parties to the dispute and the University; however, the arbitrator shall be without power to
> a) make a decision which requires the commission of an act prohibited by law;
> b) substitute his or judgment on the professional qualification of a faculty member for the judgment of the relevant academic committee, or
> c) add to, subtract from, or modify the provisions of the Faculty Handbook, the Academic Operations Manual, or other relevant University documents.

own." And both the president and the board of trustees remain entirely free to disregard the favorable Appeals Committee recommendation forwarded by the provost pursuant to the arbitrator's directive. Consequently, the president will still receive nothing more than a recommendation, not a conclusive determination. Thus the most that a tenure candidate can achieve through arbitration is the substitution of the Appeals Committee's positive recommendation for the provost's negative recommendation.

Nor does the contract manifest an intent that arbitration be the exclusive means for addressing a dispute over tenure. The handbook speaks only of the candidate having a "right" to request arbitration. It is true that there is authority for the proposition that in some circumstances courts have the power to enforce agreements that *require* arbitration even when such arbitration is nonbinding. *See AMF, Inc. v. Brunswick Corp.*, 621 F.Supp. 456, 461 (E.D.N.Y.1985) (Weinstein, J.) (holding an agreement requiring nonbinding arbitration enforceable under the FAA when there is a "reasonable ... expectation [that] the dispute will be settled" by the procedure). In this case, however, the parties have made resort to arbitration the *prerogative*, but not the *obligation*, of the tenure candidate.[7]

Northeastern's arbitral procedure does not, therefore, provide a forum for the entire resolution of a tenure candidate's dispute with Northeastern. It merely serves to provide a formal setting in which a candidate may seek reconsideration, on circumscribed "procedural" grounds, of a provost's negative recommendation. Viewed closely, then, the arbitral procedure turns out to be an option that a candidate may invoke or not as he or she chooses—an option which, if invoked, has a very limited horizon. It cannot be said that the employment contract crafted by Northeastern is one under which both the university and Brennan have committed themselves to arbitrate disputes about tenure. Northeastern appears to have agreed that it would participate in a narrowly confined form of arbitral process had Brennan chosen to invoke the process. But Brennan had no duty to make that choice. Therefore the presumption of arbitrability is overcome by the terms of the contract.[8]

■ We have concluded that the Federal Arbitration Act did not require Brennan to invoke the arbitral aspect of Northeastern's grievance system. We now turn to the question whether the Massachusetts Arbitration Act would call for a different result. We conclude that it does not. The Massachusetts Arbitration Act, Mass. Gen. Laws ch. 251 § 1 et seq. adopts the Uniform Arbitra-

---

**7.** Even if applicable here, the *AMF* approach would not compel a different outcome. Because the contract at issue here imposes strict constraints on the scope of the arbitrator's authority and severely limits the effect of the arbitral decision, there is little ground for a "reasonable ... expectation" that the procedure will resolve the dispute. *Accord Harrison v. Nissan Motor Corp.*, 111 F.3d 343, 350 (3d Cir.1997)(applying the logic of *AMF* to determine that a nonbinding dispute resolution provision contained in a warranty—and labeled by the warranty's drafter as "arbitration"—"does not constitute arbitration within the meaning of the FAA").

**8.** Appellees have urged that the policies underlying the Act require arbitration here. We disagree. To be sure, FAA jurisprudence is grounded in the "liberal federal policy favoring arbitration." *See, e.g., Volt Information Sciences, Inc. v. Leland Stanford Junior University*, 489 U.S. 468, 474, 109 S.Ct. 1248, 1253, 103 L.Ed.2d 488 (1989). But the practical effect of this policy preference in the present setting is the application of the presumption of arbitrability, a presumption which is, as we have seen, overcome by the terms of the contract describing the arbitral aspect of the grievance process. Thus, when a court is interpreting a putative agreement to arbitrate a dispute, the federal policy favoring arbitration is not a free-standing ground upon which to remit parties to arbitration, but one that informs the court's interpretation. *See First Options*, 514 U.S. at 947, 115 S.Ct. at 1925 ("[T]he basic objective in this area is not to resolve disputes in the quickest manner possible, no matter what the parties' wishes, but to ensure that commercial arbitration agreements, like other contracts, are enforced according to their terms.") (citation and internal quotation marks omitted); *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 220, 105 S.Ct. 1238, 1242, 84 L.Ed.2d 158 (1985) ("[P]assage of the Act was motivated, first and foremost, by a congressional desire to enforce agreements into which parties had entered, and we must not overlook this principal objective when construing the statute, or allow the fortuitous impact of the Act on efficient dispute resolution to overshadow the underlying motivation.").

tion Act, and its relevant language closely tracks that of the federal statute.[9] The Massachusetts courts have interpreted this statute, as it relates to the scope of the agreement to arbitrate, in conformity with (and sometimes with reference to) federal authority. *See, e.g., Unisys Finance Corp. v. Allan R. Hackel Org., Inc.,* 42 Mass.App.Ct. 275, 676 N.E.2d 486, 489 (1997); *Town of Danvers v. Wexler Construction Co., Inc.,* 12 Mass.App.Ct. 160, 422 N.E.2d 782, 784 (1981). Hence under Massachusetts arbitration law, we find a similar presumption of arbitrability, which can similarly be overcome by a showing that the particular dispute at issue is not subject to arbitration by the terms of the agreement. *See Unisys,* 676 N.E.2d at 489 (quoting *Hurlbut v. Gantshar,* 674 F.Supp. 385, 390 (D.Mass.1987)("In the absence of an actual agreement to arbitrate a particular dispute or class of disputes, the Court cannot compel arbitration.")). Therefore, for the reasons set forth above, we conclude that the Massachusetts Arbitration Act did not require Brennan to arbitrate this dispute.[10]

## C. Exhaustion

■ Appellees also raise arguments that can be characterized as invoking exhaustion principles.[11] Although neither appellees'
brief nor appellant's brief separates the possible ingredients of the concept of "exhaustion," we think that, for the purposes of coherent analysis, certain distinctions must be drawn. First, appellees may be understood to be invoking familiar concepts of exhaustion of administrative remedies. Alternatively (or additionally), they may be regarded as arguing that some source of law requires exhaustion of possible contractual remedies before bringing suit. We will discuss each of these possibilities. As it relates to Brennan's breach-of-contract claim, the contractual exhaustion issue merits independent consideration under state law and will accordingly be addressed separately below.

### 1. Brennan's Statutory and Constitutional Claims

■ We first consider Brennan's claims alleging violation of federal and state anti-discrimination laws. Brennan has alleged violations of the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.*, the Rehabilitation Act, 29 U.S.C. § 794 *et seq.*, and several Massachusetts anti-discrimination provisions, Mass. Const. art. 114 (prohibiting discrimination against handicapped persons); Mass. Gen. Laws ch. 151B, § 4(1), (16) (prohibiting employment discrimination on the bases of

---

**9.** 9 U.S.C. § 2 reads:

A written provision in any maritime transaction or a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction, or the refusal to perform the whole or any part thereof, or an agreement in writing to submit to arbitration an existing controversy arising out of such a contract, transaction, or refusal, shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.

Similarly, the Massachusetts law, Mass. Gen. Laws ch. 251, § 1, states:

A written agreement to submit any existing controversy to arbitration or a provision in a written contract to submit to arbitration any controversy thereafter arising between the parties shall be valid, enforceable and irrevocable, save upon such grounds as exist at law or in equity for the revocation of any contract.

**10.** Because we decide that there was no agreement to arbitrate this dispute, we need not reach Brennan's arguments that ADA claims are not amenable to arbitration or that he did not make

a knowing waiver of his right to a judicial forum for resolution of his federal claims.

**11.** Although the parties refer to *exhaustion* and *enforcement of arbitration promises* somewhat interchangeably, these concepts must be distinguished. Exhaustion doctrine—generally confined to the administrative arena—requires that administrative processes be invoked before requesting judicial relief. *See, e.g., McKart v. United States,* 395 U.S. 185, 193–95, 89 S.Ct. 1657, 1662–63, 23 L.Ed.2d 194 (1969). Arbitration, when enforced pursuant to the Federal Arbitration Act, is more a *substitute for* than a *precursor to* judicial intervention. *See First Options,* 514 U.S. at 942, 115 S.Ct. at 1923. Once parties have been remitted to arbitration and an award is lawfully entered, no party may sue *de novo.* An arbitral award is binding on the parties and may only be set aside on very narrow statutory grounds—such as fraud in relation to the arbitration agreement or corruption or partiality on the part of the arbitrator, 9 U.S.C. § 10—or on the ground that the arbitrator (who is not required to issue a written opinion) is found to have committed "manifest disregard of the law." *First Options,* 514 U.S. at 942, 115 S.Ct. at 1923.

sexual orientation and disability); Mass. Gen. Laws ch. 93, § 103(a) (Massachusetts Equal Rights Act).

■ It is true that Brennan's claims under the ADA and under the Massachusetts anti-discrimination statutes are subject to the exhaustion doctrine, which requires a claimant to pursue administrative remedies before filing suit.[12] Brennan, however, fully pursued his discrimination claims with both the EEOC and the MCAD. Appellees have not suggested that Brennan's pursuit of administrative remedies was in any way inadequate to fulfill the exhaustion requirements that obtain.

Appellees have, however, also sought to invoke the exhaustion doctrine in order to require Brennan to exhaust potential *contractual* remedies. With respect to Brennan's federal and state civil rights claims, we find no ground to require this type of exhaustion. The federal statutes and the Massachusetts constitutional and statutory provisions invoked by Brennan reveal no indication that potential contractual avenues of relief must be pursued prior to suit. Furthermore, appellees have not cited, and we have not found, any cases suggesting that such a requirement inheres in the relevant federal or state provisions.

Appellees point out that the Supreme Court has required union members who have a grievance under a collective bargaining agreement to invoke the grievance and arbitration machinery established by that contract before resort to court. *See Republic Steel v. Maddox*, 379 U.S. 650, 652, 85 S.Ct. 614, 616, 13 L.Ed.2d 580 (1965); *Vaca v. Sipes*, 386 U.S. 171, 184, 87 S.Ct. 903, 913–14, 17 L.Ed.2d 842 (1967). Stated another way, in the collective bargaining context, there is a requirement that union members exhaust

available contractual remedies before bringing suit. True as this is, it has no relevance to Brennan's federal and state statutory claims or his state constitutional claims. The record does not suggest that Brennan is a member of a bargaining unit covered by a collective bargaining agreement. Appellees have pointed to no cases, nor have we found any, that extend the contractual exhaustion doctrine from federal labor law into the individual employment setting to bar litigation of statutory or constitutional civil rights claims.

To the extent that appellees' argument may be understood to invite us to make such an extension, we are unpersuaded. Arbitration—as part of a contractual grievance procedure—is granted an especially privileged position in labor law because it is considered integral to the bargaining process and serves to avoid industrial conflict:

> In the commercial case, arbitration is the substitute for litigation. Here arbitration is the substitute for industrial strife.... [Arbitration of labor disputes under collective bargaining agreements] is part and parcel of the collective bargaining process itself.
>
> The collective bargaining agreement states the rights and duties of the parties. It is more than a contract; it is a generalized code to govern a myriad of cases which the draftsmen cannot wholly anticipate. The collective bargaining agreement covers the whole employment relationship.
>
> ... Arbitration is the means of solving the unforeseeable by molding a system of private law for all the problems which may arise and to provide for their solution in a way which will generally accord with the variant needs and desires of the parties. The processing of disputes through the

12. The applicable provision of the ADA derives its procedural rules from Title VII of the Civil Rights Act, which requires exhaustion. *See Rivera–Flores v. Bristol–Myers Squibb Caribbean*, 112 F.3d 9, 12 (1st Cir.1997); 42 U.S.C. § 12117(a). Under Massachusetts law, "a timely complaint must be filed with the MCAD before a plaintiff can proceed with an action in the Superior Court." *Harrison v. Boston Fin. Data Servs., Inc.* 37 Mass.App.Ct. 133, 638 N.E.2d 41, 43 n. 7 (1994); *Lattimore v. Polaroid Corp.*, 99 F.3d 456, 464 (1st Cir.1996).

Unlike the ADA and the Massachusetts statutes, the Rehabilitation Act does not require exhaustion. The Rehabilitation Act derives its procedural requirements from Title VI, which does not have an exhaustion requirement. *See Cook v. Rhode Island Dept. of Mental Health, Retardation, and Hospitals*, 783 F.Supp. 1569, 1572 (D.R.I. 1992), *aff'd*, 10 F.3d 17 (1st Cir.1993). Accordingly, to the extent that exhaustion is relevant, it does not bear on petitioner's claim under the Rehabilitation Act.

grievance machinery is actually a vehicle by which meaning and content are given to the collective bargaining agreement.

... The grievance procedure is, in other words, a part of the continuous collective bargaining process. It, rather than a strike, is the terminal point of a disagreement.

*United Steelworkers of America v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 578–79, 80 S.Ct. 1347, 1351–52, 4 L.Ed.2d 1409 (1960)(footnotes and citations omitted).

Thus the exhaustion requirement in federal labor law serves to protect the integrity of collective bargaining as a whole. No comparable interests would be served by enforcing an exhaustion requirement here. Brennan is not seeking to vindicate contractual rights secured through the collective bargaining process; rather, he is suing to vindicate individual rights conferred by federal and state law. Furthermore, as the discussion in part II.B above demonstrates, the "arbitration" provided by the university's contract with Brennan is, with respect to tenure disputes, neither capable of rendering a binding judgment nor contractually mandatory. Thus it does not share the usual features of the grievance and arbitration mechanisms typical of collective bargaining agreements. The arbitration clause at issue here is not a vehicle for giving meaning to a "generalized code," but a mechanism that can be fairly characterized as contemplating a purely advisory function within a narrowly circumscribed grant of jurisdiction. Consequently, we conclude that Brennan was not bound to exhaust the arbitration aspect of the handbook procedure before bringing his discrimination claims.[13]

### 2. *Brennan's State–Law Claim for Breach of Contract*

 Although there is no source of law indicating that Brennan was bound to exhaust the contractual grievance mechanism prior to bringing suit on his federal and state statutory and his state constitutional claims, Massachusetts law does require, at least in some instances, that contractual grievance procedures be pursued before suit may be brought under the common law of Massachusetts for breach of an employment contract. In *O'Brien v. New England Telephone & Telegraph Co.*, 422 Mass. 686, 664 N.E.2d 843, 849 (1996), the Supreme Judicial Court of Massachusetts held that when an employee manual constituting an enforceable contract of employment sets up a grievance procedure, an employee who refuses to use that procedure may not resort to a judicial forum to assert claims of wrongful discharge based on that manual.

The plaintiff in *O'Brien* sued for wrongful discharge, basing her claim upon an employee manual that set forth a four-step grievance procedure for claims "that an employee has, in any manner, been unfairly treated." *Id.* 664 N.E.2d at 849. O'Brien, however, declined to invoke the manual's procedures and instead brought her wrongful discharge action in state court. After O'Brien won a jury verdict, the Supreme Judicial Court of Massachusetts granted direct review and reversed.

· The court ruled that the manual not only created rights enforceable by the employee, but also obligations that bound the employee. *Id.* at 848–49. The court concluded that O'Brien was obligated to pursue the contractual grievance procedures set forth in the manual:

When a collective bargaining agreement provides a grievance procedure, the general rule is that the remedies specified in the agreement be exhausted before an employee may resort to the courts. .... We see no justification for treating differently an employee asserting rights under a personnel manual that contains a grievance procedure....

The grievance procedure provided a ready means by which O'Brien could have brought to the attention of management [a supervisor's] unfair treatment of her.... Pursuit of this available process might have demonstrated sufficient mitigating circumstances to rebut what management might otherwise have perceived as "gross violations" of rules or law that were "cause for immediate discharge."

---

**13.** Brennan's complaint also alleges fraud, misrepresentation, intentional and/or negligent infliction of emotional distress, and civil conspiracy. We find nothing peculiar to these claims that would require exhaustion of contractual procedures. Accordingly, we conclude that Brennan may pursue these claims as well in the district court.

*Id.* at 849. Hence, we take *O'Brien* as a determination that, as a matter of Massachusetts employment law, one who alleges wrongful termination based upon a contract of employment which includes a grievance procedure cannot seek vindication of the claim in court without first invoking the contractual grievance procedure.

Since Brennan's claims of common-law breach of contract are predicated upon a contract of employment containing a grievance procedure, we find that these claims are not meaningfully distinguishable from the claims pursued in *O'Brien.* In light of the Supreme Judicial Court's ruling in *O'Brien,* then, we conclude that, under Massachusetts law, Brennan was required to pursue the grievance procedure outlined in his contract of employment before maintaining suit for breach of the employment contract, and we therefore affirm on that issue.

### Conclusion

For the foregoing reasons the judgment of the district court granting summary judgment in favor of the defendants is reversed with respect to Brennan's non-contractual claims. The district court's judgment is affirmed as to Brennan's claims of breach of contract. The case is remanded for further proceedings consistent with this opinion.