Borenstein, Issac, J.

INTRODUCTION

Plaintiff Carol A. Warfield, M.D. (Dr. Warfield) filed this gender discrimination action against defendants Beth Israel Deaconess Medical Center, Inc. (BIDMC), Harvard Medical Faculty Physicians at Beth Israel Deaconess Medical Center, Inc. (HMFP), Josef E. Fischer, M.D (Dr. Fischer), and Paul F. Levy (Mr. Levy) for allegedly engaging in wrongful conduct during her employment and leading up to her termination as Chief of Anesthesiology. The defendants now move the court to stay discovery, dismiss the complaint and compel arbitration, or alternatively, to stay the pro *635 ceedings pending arbitration.[2] For the reasons set forth below, the defendants’ motions are DENIED.

BACKGROUND

In assessing the merits of amotion to dismiss under Mass.R.Civ.P. 12(b)(6), the court takes as true “the [following] allegations of the complaint, as well as such inferences as may be drawn therefrom in the plaintiff s favor . . .” Blank v. Chelmsford Ob/Gyn, P.C., 420 Mass. 404, 407 (1995).
In the late 1970s, Dr. Warfield became a member of the Department of Anesthesia, Critical Care and Pain Medicine (the Department) at BIDMC, after working there for two years as a resident and fellow. In 1980, Dr. Warfield joined BIDMC as an assistant anesthetist and also became an instructor at Harvard Medical School (HMS). In 1985, Dr. Warfield was promoted to Associate Anesthetist at BIDMC, and following that promotion also became Assistant Professor at HMS. In 1994, she was promoted to Associate Professor of Anesthesia at HMS. In 1997, Dr. Warfield was promoted to Chief of the Division of Pain Medicine at BIDMC and also to the Vice-Chair for Academic Affairs, for her efforts in developing the Pain Management Center into an internationally renowned and financially successful endeavor for BIDMC and also into the largest pain management training program in the world.
By 1998, the Department, along with BIDMC generally, suffered serious financial and administrative problems and lost most of its anesthesiologists in addition to its Chief. For almost two years, the Department had no leader and experienced difficulty attracting new anesthesiologists. BIDMC actively recruited Dr. Warfield for this position. To assure her that acceptance of the position would not limit her future employment options with BIDMC, the CEO of BIDMC pledged that she would not be penalized for focusing mainly on administrative and departmental matters rather than her own educational and clinical work. On these assurances, Dr. Warfield accepted the position of Chief of Anesthesiology, or Anesthesiologist-in-Chief, in January 2000. At the same time, HMS appointed her the Edward Lowenstein Professor of Anesthesia, which carried with it a stipend and right to Harvard employee benefits.
In late March of 2000, Dr. Warfield formalized her appointment to the position of Chief of Anesthesiology at BIDMC by entering into a contract (Agreement) with BIDMC and HMFP.[3] The Agreement, entitled Employment Agreement, encompasses details pertinent only to her appointment as Chief. Although the Agreement appoints Dr. Warfield to the position of Chief of Anesthesiology, the Agreement specifically designates her status as an employee of HMFP providing services as Chief to the BIDMC. Under the Employment provision, Dr. Warfield was required to provide her services to BIDMC and HMFP, as further detailed within the Agreement, in a manner consistent with the articles, bylaws, rules, guidelines, regulations, procedures or standards established and maintained by the BIDMC, Professional Staff of the BIDMC, the Department of Anesthesia, and HMFP; that provision also required Dr. Warfield to abide by the applicable policies of HMS. The term of the Agreement was from year to year until terminated pursuant to two termination clauses. Among other things, the Agreement specified Dr. Warfield’s duties as Chief; provided for the assignment of her right to charge and bill for her clinical services; set forth certain requirements regarding her appointment to certain academic positions at HMS; described the benefits and compensation to which she was entitled; granted her the right to a one-year sabbatical after six years as Chief without having to resign from that position; stipulated the circumstances under which she could be terminated for cause and without cause; and required the parties to submit certain disputes to arbitration.[4]
As Chief of Anesthesiology, Dr. Warfield experienced much success and earned the respect of her colleagues. Soon after her appointment, she worked to adequately staff the Department with anesthesiologists so that no operating room would be inaccessible for lack of anesthesia support. Outside independent reviewers of the Department noted her skill and ability as Chief and, in particular, remarked on her skill in working collaboratively and creating good relationships. Overall, these reviewers found the Department under Dr. Warfield’s leadership as Chief to be strong in clinical, educational, and research.
In the fall of2001, BIDMC hired Dr. Fischer as Chief of Surgery at BIDMC, despite his reputation for being “old style” and his demonstrated tendency to be abusive toward and unable to work with professional women. In January of2002, Mr. Levy was hired as the President and Chief Executive Officer of BIDMC.
Within his first year at BIDMC, Dr. Fischer treated Dr. Warfield with disdain on matters of hospital protocol and policy and made baseless accusations about her work to others. Dr. Warfield attempted to create a collegial relationship with him, but he refused to interact with her as a peer. Over time, Dr. Fischer became increasingly hostile toward her: he shut doors in her face; declined to meet with her alone and insisted that she be accompanied by male subordinates or colleagues; and he would purposefully look to and respond to male colleagues, not to her, when she spoke. Dr. Fischer also engaged in such conduct with other female staff at the hospital; at a lecture to BIDMC, he was reported to have stated his preference for tall light skinned, western-taught male residents from the western part of the world.
Troubled by Dr. Fischer’s behavior, Dr. Warfield spoke to Mr. Levy on a number of occasions. Rather than investigate and remedy Dr. Fischer’s conduct, Mr. Levy aided and abetted it. Mr. Levy claimed he could do nothing when Dr. Warfield reported that Dr. *636 Fischer was defaming her and attempting to solicit support to remove her as Chair. However, in May of 2002, Mr. Levy investigated Dr. Warfield’s personal attendance based on the “widespread impression” that she was unavailable at the hospital; these allegations, proven by Dr. Warfield to be false and misleading, were propounded by Dr. Fischer.
In late November of 2002, Dr. Warfield again complained to Mr. Levy and the BIDMC’s Chief Operating Officer, Michael Epstein, M.D., but she was told that there was nothing they could do to make a difference. In an attempt to somehow remedy the situation, Dr. Warfield spoke to the ombudsperson at HMS, who told her that other employees, mostly women, had complained about Dr. Fischer; in response the Dean of HMS spoke to Mr. Levy, who did nothing about it. Mr. Levy was finally required to conduct his own investigation into Dr. Fischer, when the doctor screamed at a female anesthesiologist, in front of a patient and other staff. Although Mr. Levy characterized the incident as unfortunate and promised to work with Dr. Fischer to remedy these behaviors, Dr. Fischer was not seriously disciplined in any way. Disturbed by BIDMC’s response, Dr. Warfield sought Mr. Levy’s assistance to ensure the female staff member the safe workplace she was entitled to, but Mr. Levy criticized Dr. Warfield for her “lack of leadership” and “playing the victim.” Moreover, Mr. Levy told her that it was her responsibility to adjust to Dr. Fischer’s “personal approach.” In response to the November 2002 incident, Dr. Fischer blamed Dr. Warfield for what had happened, chiding her for not stopping her staff from complaining about him and threatening that she herself would suffer the consequences. He stated that if Dr. Warfield didn’t like the way she was being treated, she should step down from her position as Chief and “run away.”
In the years leading up to her sabbatical, Dr. War-field experienced further acts of hostility from Dr. Fischer and suffered the same indifference and unresponsiveness from Mr. Levy. Finally, in the summer of 2006, Dr. Warfield took a sabbatical leave, as permitted under the Agreement. While she was away, Dr. Fischer made unfounded accusations about her competence and announced that he was circulating a petition to have her terminated at a gathering of the American College of Surgeons during the spring of 2007. That May, Mr. Levy contacted Dr. Warfield to inquire if she was planning to return to BIDMC as Chief from her sabbatical; she responded that she would. On the eve of her return from sabbatical in June of2007, Mr. Levy wrote to Dr. Warfield asking for her resignation as Chief of Anesthesiology; she had five days to respond. On June 19, 2007, Dr. Warfield informed the BIDMC that she would not resign. On June 28, 2007, Dr. Warfield and Mr. Levy met to discuss the resignation; Dr. Warfield left the meeting believing that their issues were resolved to her satisfaction. However, on July 18,2007, Mr. Levy, via email, terminated Dr. Warfield’s appointment as Chair, effective immediately. The following day, Dr. Warfield’s termination was announced to the Department.

DISCUSSION

For purposes of a motion brought under Mass.R.Civ.P. 12(b)(6), the allegations contained in the complaint must be treated as true, and the plaintiff is entitled to all favorable inferences to be drawn therefrom. See Gen. Motors Acceptance Corp. v. Abington Cas. Ins. Co., 413 Mass. 583, 584 (1992). Amotion to dismiss on this ground should be granted only if “it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.” Id. (citations omitted). The plaintiffs burden in opposing the motion has been characterized as one which is “relatively light.” Warner-Lambert v. Execuquest Corp., 427 Mass. 46, 47 (1998), citing Gibbs Ford, Inc. v. United Truck Leasing Corp., 399 Mass. 8, 13 (1987). At the same time, however, the rule does allow for the prompt resolution of a case where the allegations in the complaint clearly demonstrate that the plaintiffs claim is legally insufficient. Harvard Crimson v. President & Fellows of Harvard Coll., 445 Mass. 745, 749 (2006).[5]
The Massachusetts Arbitration Act (the Act), G.L.c. 251, §2(b), governs motions to compel arbitration and stay litigation.[6] The Act provides that where parties have entered a valid agreement to arbitrate, a person aggrieved by another’s refusal to arbitrate may petition the Superior Court to enforce the arbitration agreement by court order. See c 251, §2(a). “If the opposing party denies the existence of the agreement to arbitrate, the court shall proceed summarily to the determination of the issue ... and shall order, if it finds for the applicant, arbitration; otherwise, the application shall be denied.” Id.
Section 1 of G.L.c. 251, “closely tracks” the language of the Federal Arbitration Act, 9 U.S.C. §2. Brennan v. King, 139 F.3d 258, 267 (1st Cir. 1998). A court should give “due regard ... to the federal policy favoring arbitration, and [resolve] ambiguities as to the scope of the clause ... in favor of arbitration.” Id. at 264-65. Notwithstanding this legislative preference for arbitration, when construing the agreement, general state law contract interpretation principles apply. Id.
As a matter of basic contract law, a party cannot be required to submit to arbitration any grievance or claim which she has not agreed to so submit. See Muanano-Bornstein v. Cromwell, 42 Mass.App.Ct. 347, 351-53 (1997). As the United States Supreme Court explained, “(a]rbitration ... is a matter of consent, not coercion, and parties are generally free to structure their arbitration agreements as they see fit. Just as they may limit by contract the issues which they will arbitrate, see Mitsubishi Motors Corp. v. Soler Chrysler-Ply mouth Inc., 473 U.S. 614, 628 (1985), so too may they specify by contract the rules under which that arbitration will be conducted.” Mastrobuono v. *637 Shearson Lehman Hutton, Inc., 514 U.S. 52, 57-58 (1995), quoting Volt Info. Sciences, Inc. v. Bd. of Trustees of Leland Stanford Jr. Uniu., 489 U.S. 468 (1989).
Thus, a court resolves questions of arbitrability, and will compel arbitration if the arbitration clause governs the dispute. Drywall Sys, Inc. v. ZVI Constr. Co., Inc., 435 Mass. 664, 666 (2002). In order to compel arbitration, a court must find (1) a valid and enforceable written agreement to arbitrate exists between the parties; (2) the disputéis arbitrable; and (3) the moving party has not waived his or her right to demand arbitration. See Gonzalez v. GE Group Adm’rs, Inc., 321 F.Sup.2d 165, 168 (D.Mass. 2004).
Here, there is no dispute that the parties executed a valid and enforceable written arbitration clause. Accordingly, the court must look to the remaining factors to determine whether the dispute between the parties must be arbitrated. Because the agreement contains a broad arbitration clause encompassing all the claims within Dr. Warfield’s complaint, the defendants argue that her claims must be resolved at arbitration.[7] Contrarily, Dr. Warfield contends that her claims do not fall within the purview of matters covered by the clause and are thus not arbitrable.
The arbitration clause within the agreement provides, in pertinent part, that “(a]ny claim, controversy or dispute arising out of or in connection with this Agreement or its negotiations shall be settled by arbitration.” The scope of the arbitration provision cannot be appreciated, without reference to the scope of the agreement. Therefore, the scope of the arbitration clause, and the matters encompassed by it, are necessarily constrained by the scope of the agreement; where the scope of the subject matter of an agreement is narrow, so too will be the scope of the arbitration clause.
As the provision above clearly states, arbitrable claims are those “arising out of or in connection with this Agreement or its negotiations.” Looking to the Agreement, it is clear that it addresses a restricted range of subject matter and is primarily limited to delineating the responsibilities and rights of Dr. War-field in her position as Chief. In exchange for Dr. Warfield’s performance as Chief, the Agreement also imposes limited obligations on and grants limited rights to BIDMC and HMFP, such as their obligation to provide compensation and benefits to Dr. Warfield and BIDMC’s right to termination. Outside of the narrow range of essential terms governing Dr. Warfield’s appointment as Chief, however, the agreement fails to address any matters relevant to governing the conduct of the parties or their employment relationship during Dr. Warfield’s tenure as Chief. As such, the agreement imposes no duty on BIDMC, HMFP, or their respective employees to refrain from engaging in unlawful discrimination or other wrongful conduct against Dr. Warfield during her employment as Chief. Indeed, the Agreement makes no reference to such conduct and makes no provision for the rights or responsibilities of the parties under such circumstances. Accordingly, Dr. Warfield’s claims for gender discrimination, retaliation, and tortious interference are not arbitrable because the Agreement makes no provision whatsoever for such wrongful conduct and fails wholesale to address such matters, directly or by fair inference.
Defendants cite to various cases for the proposition that a broadly framed arbitration clause necessarily encompasses claims of employment discrimination and retaliation under G.L.c. 15IB. Drywall Systems involved an arbitration clause that bound the parties to arbitrate “(a]ny controversy or claim . •. . arising out of or related to this (s)ubcontract.” 435 Mass. at 665. The parties in Drywall, a general contractor and subcontractor, entered into several construction subcontracts, and the subcontractor’s claim regarding unpaid balances under the subcontracts arose directly from the subject matter of the subcontracts — payment in exchange for the performance of construction work. In Mugnano-Bornstein, the plaintiff completed and signed an employment application containing an agreement to arbitrate any “controversy arising out of or in connection with [her] compensation, employment or termination of employment.” 42 Mass.App.Ct. at 348. There, the court found that plaintiffs common-law claims and claims of sexual harassment and gender discrimination under G.L.c. 93 and c. 151B arose out of her employment and subsequent termination — matters expressly addressed by the arbitration clause within the plaintiffs general employment application. Id. at 352 (emphasis added). Finally, in Carpenter v. Pomerantz, the court upheld the arbitrability of a dispute regarding the termination of a CEO based on an arbitration clause within an employment agreement requiring arbitration of “(a]ny controversy or dispute arising out of or relating to this Agreement or the breach or interpretation thereof (including, but not limited to, whether [the employer] had ‘cause’ to terminate the Executive’s employment hereunder).” 36 Mass.App.Ct. 627, 629 (1994). Of key importance to the court’s ruling in Carpenter was that the “language of the arbitration clause specifically makes the circumstances of the termination of the [employee’s] employment subject to arbitration." Id. at 360 (emphasis added).
None of these cases cited above, however, is dispos-itive of the issue here because the circumstances and contractual provisions in those cases are distinguishable from ones presented here. Unlike Drywall, the claims presented here do not directly relate to the subject matter of the Agreement. Dr. Warfield’s claims center on the wrongdoing of the defendants in engaging in a pattern and practice of gender discrimination, harassment, and retaliation over the entire course of her tenure as Chief and leading up to her termination. In contrast, the scope of the Agreement in place here *638 is chiefly limited to a skeletal outline of the specific rights and responsibilities of Dr. Warfield as Chief, and nothing within the Agreement either speaks to issues or disputes — such as the ones here — that might arise during the course of that relationship or their resolution. Unlike the provisions in Mugnano or Carpenter, here there is no specific language in the arbitration clause requiring arbitration of Dr. Warfield’s “employment,” “termination” (whether for “cause”), or of any “breach” of the Agreement. Essentially, the clauses cited in the cases above differ from the clause in Dr. Warfield’s Agreement in that they make clear the intention of the parties to arbitrate a broad range of matters related to the subject matter of the agreement. Completely dissimilar from these examples is the arbitration clause in Dr. Warfield’s Agreement, which contains no express terms showing that her employment or termination would be subject to arbitration, and the Agreement itself, which is narrowly drafted to address her rights and responsibilities as Chief, and not the employment relationship of the parties.
To the extent that Dr. Warfield’s claims involve conduct leading to her termination (a matter addressed by the agreement), and thus may arise out of the Agreement, such claims are also not arbitrable. Two clauses within the agreement govern Dr. Warfield’s termination as Chief. Under the provision for Termination of Employment for Cause, “[BIDMC] may terminate [Dr. Warfield’s] appointment as Anesthesiologist-in-Chief for Cause, which shall cause the automatic termination of this Agreement, effective immediately. Termination for Cause shall be effective no sooner than 30 (thirty) days following written notice to [Dr. Warfield] of the nature of the cause.”[8] Mr. Levy terminated Dr. Warfield on July 18, 2007, and the termination was effective immediately. Assuming without deciding that Mr. Levy fired Dr. Greenfield for cause, Mr. Levy materially breached the Agreement by causing the termination to take immediate effect, in violation of the requirement that termination take effect no sooner than 30 days following written notice. Because of this material breach, any obligation on Dr. Warfield’s part to arbitrate her claims under the Agreement is relieved. See Ward v. Am. Mut. Liab. Ins. Co., 15 Mass.App.Ct. 98, 100-01 (1983) (“It is well established that a material breach by one party excuses the other party from further performance under the contract”).
The second termination clause governs the BIDMC’s termination of Dr. Warfield from her position of Chief without cause and states that “this Agreement shall terminate at the same time as [Dr. Warfield’s] position as Anesthesiologist-in-Chief terminates.” Assuming Dr. Warfield was terminated without cause, this provision results in the termination of the agreement upon her termination as Chief. Assuming without deciding that Dr. Warfield was terminated without cause, the Agreement would terminate upon that occurrence, and the arbitration clause would lose its effect since nothing within the Agreement provides for the survival of this clause. With the Agreement terminated and the arbitration clause without effect, Dr. Warfield cannot be bound to arbitrate her claims.
Because the Agreement is limited to the narrow scope of Dr. Warfield’s rights and responsibilities as Chief, and does not govern her employment relationship with the defendants or any disputes arising from her employment relationship with them, her particular claims here do not arise out of or in connection with the Agreement. Accordingly, Dr. Warfield’s claims are not subject to arbitration. To the extent that her claims relate to her termination, BIDMC’s dismissal of Dr. Warfield as Chief, whether for or without cause, terminated the Agreement and thus abrogated her obligation to submit to arbitration.

ORDER

For the foregoing reasons, it is hereby ORDERED that the defendants’ motions are DENIED.

Fischer has filed his own separate Motion to Stay Discovery, Dismiss Complaint, and Compel Arbitration on largely the same grounds as HMFP. If and where necessary, the court will address the separate arguments of the defendants.

The agreement is not attached to the pleadings but has been appended to the defendants’ motions and to Dr. Warfield’s oppositions. There is no dispute as to the authenticity of this agreement.

The agreement also contained a few other provisions of little to no relevance to this decision.

Last year, the United States Supreme Court modified the standard for deciding a motion to dismiss by requiring the plaintiff to plead “enough [factual allegations] to raise a right to relief above the speculative level.” Bell Atl. Corp. v. Twombly, 127 S.Ct. 1955, 1965 (2007). The Massachusetts Supreme Judicial Court has adopted this more rigorous standard. See Iannacchino v. Ford Motor Co., 451 Mass. 623 (2008). Since Warfield filed her complaint before these recent changes, the prior standard applies. See Eigerman v. Putnam Invs., Inc. 450 Mass. 281, 286 n.7 (2007)..

“[A] issue subject to arbitration shall be stayed if an order for arbitration or an application . .. has been made .. . when the application is made in such proceeding, the order for the arbitration shall include such stay.” G.L.c. 251, §2(d).

Dr. Fischer also argues that Dr. Warfield’s complaint should be dismissed pursuant to Mass.R.Civ.P. 8 and 12(f). The court declines to do so on these grounds.

Nothing in the Agreement states that the arbitration clause is to survive termination of the Agreement. Therefore, it is clear that the effect of the arbitration clause terminates with the Agreement.