**Lynette M. PETRUSKA, Plaintiff**

v.

**GANNON UNIVERSITY, et al., Defendants.**

**Civil Action No. 04–80 Erie.**

United States District Court, W.D. Pennsylvania.

Dec. 27, 2004.

AnnDrea M. Benson, Esq., Edinboro, PA, C. John Pleban, Esq., Pleban & Associates, St. Louis, MO, Attorneys for Plaintiff.

Evan C. Rudert, Esq., Elderkin, Martin, Kelly & Messina, Erie, PA, Attorney for Gannon University, The Board of Trustees, and Defendants Trautman, Rubino, Garibaldi, and Rouch in their official capacities.

Kenneth W. Wargo, Esq., Frank L. Kroto, Jr., Esq., Quinn, Buseck, Leemhuis, Toohey & Kroto, Inc., Erie, PA, Attorneys for Defendants Trautman, Rubino, Garibaldi, and Rouch in their individual capacities.

### MEMORANDUM OPINION

MCLAUGHLIN, District Judge.

This case is brought by Plaintiff, Lynette M. Petruska, against Gannon University, its Board Members, and certain of its current or former officials and arises out of disputes relating to her prior employment as Chaplain for the University. Petruska's First Amended Complaint asserts various state law claims as well as claims of retaliatory and gender-based employment discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000(e) *et seq.* Defendants have moved to dismiss the First Amended Complaint in its entirety for lack of subject

matter jurisdiction. Because we conclude that we are prohibited on First Amendment grounds from adjudicating Plaintiff's claims, the Defendants' motions will be granted.

## I.  STANDARD OF REVIEW

██ We note at the outset that Defendants' motions present a facial challenge to this Court's subject matter jurisdiction. *See Gould Electronics, Inc. v. United States*, 220 F.3d 169, 176 (3d Cir.2000) (a Rule 12(b)(1) motion may be treated as either a facial or factual challenge to the court's subject matter jurisdiction). In reviewing a facial attack, courts consider only the allegations of the complaint and documents referenced therein and attached thereto and must view them in the light most favorable to the plaintiff. *Id.* Thus, unlike a factual attack, which requires the court to " 'weigh the evidence and satisfy itself as to the existence of its power to hear the case,' " a facial attack "offers the plaintiff the safeguard of requiring the court to consider the allegations of the complaint as true." *Doe v. Goldstein's Deli*, 82 Fed.Appx. 773, 775, No. 02–1361, 2003 WL 22998139 at *1 (Dec. 19, 2003) (quoting *Mortensen v. First Federal Sav. and Loan Ass'n*, 549 F.2d 884, 891 (3d Cir.1977)).

Nevertheless, we also note that Plaintiff's various submissions in opposition to the motions to dismiss assert factual allegations and/or make reference to documents not included within her First Amended Complaint or appended thereto. To the extent Plaintiff makes reference to matters outside of the pleadings, we construe her position as an informal request to further amend her First Amended Complaint consistent with the factual allegations contained in her oppositional papers. In short, the Court has considered all of the Plaintiff's submissions, and we have credited Plaintiff's allegations for the purpose of testing whether there are genuine disputed issues in existence that would bear on this Court's subject matter jurisdiction.

Regardless whether Defendants' motion is construed as a facial attack or a factual attack, however, it is ultimately the Plaintiff's burden to establish this Court's jurisdiction. *See Pennsylvania Protection and Advocacy, Inc. v. Houston*, 136 F.Supp.2d 353, 359 (E.D.Pa.2001) (citing *Turner v. Bank of North America*, 4 Dall. 8, 4 U.S. 8, 1 L.Ed. 718 (1799)). With this standard of review in mind, we set forth below the material allegations in Plaintiff's First Amended Complaint.[1]

## II.  BACKGROUND

Gannon University is a private, Catholic, diocesan college established under the laws of the Commonwealth of Pennsylvania and located in Erie, Pennsylvania. The University receives both federal and state funding to further its educational mission. (First Amended Complaint— hereinafter, "FAC"—at ¶ 2.)

Gannon's Board of Trustees is the University's governing body with "full and complete authority to conduct the affairs of the University." (FAC at ¶ 3.) Defendant Bishop Donald Trautman is the Bishop of the Roman Catholic Diocese of Erie

---

1. Although for present purposes we accept Plaintiff's factual averments as true, we need not credit bald assertions, unsupported conclusions, unwarranted inferences, or "legal conclusions masquerading as factual conclusions." *Pennsylvania Protection and Advocacy, Inc. v. Houston*, 136 F.Supp.2d 353, 359 (E.D.Pa.2001) (citing *Morse v. Lower Merion School Dist.*, 132 F.3d 902, 906 (3d Cir.1997); *Hunter v. United States*, No. 3:CV–00–0036, 2000 WL 1880257, *3 (M.D.Pa. Dec.15, 2000)). *See also Danvers Motor Co., Inc. v. Ford Motor Co.*, 186 F.Supp.2d 530, 538 (D.N.J.2002).

and, pursuant to Gannon's bylaws, Chair of the Gannon Board of Trustees, having certain extraordinary powers reserved to him by the Board. (FAC ¶ 4.) Defendant Monsignor David Rubino served as president of Gannon University from 1991 until his resignation in May of 2000. (FAC ¶ 5.) Thereafter, he was replaced by Defendant Antoine Garibaldi, Gannon's current president. (*Id.* at ¶ 6.) Defendant Reverend Nicholas Rouch is the part-time Vice President for Mission and Ministry at Gannon. (*Id.* at ¶ 7.)

Plaintiff was initially hired by Gannon as Director for the University's Center for Social Concerns and commenced her employment on July 16, 1997. (FAC ¶ 9.) In considering and accepting this position, Plaintiff relied upon Gannon's self-representation as an equal opportunity employer that does not discriminate on the basis of, among other things, gender. (*Id.*)

Shortly after Plaintiff was hired, Defendant Rouch—then Chaplain for the University—left his position to commence a three year period of study in Rome. (FAC ¶ 10.) Rouch received assurances from the Administration that he would return to his position as Chaplain once he concluded his studies. After Rouch's interim replacement resigned, another chaplain was needed to fill the vacancy. (*Id.*)

Effective July 1, 1999, Plaintiff was appointed Chaplain for the University. (FAC ¶ 11.) In accepting this appointment, Plaintiff sought, received, and relied upon assurances from Rubino "that she would not be used by the University only to be replaced when a male became available to fill the position, or specifically when Rouch returned from Rome." (FAC ¶ 12.) Rubino assured Plaintiff that Trautman had approved her appointment as permanent Chaplain and that her tenure would be based upon her performance, not her gender. (*Id.*) Similar representations

were made on Plaintiff's behalf to the president of Plaintiff's religious order. (FAC ¶ 14.)

Rubino subsequently took a leave of absence as Gannon's President after allegations surfaced that he had had a sexual affair with a subordinate at the University. (FAC ¶ 15.) Shortly after Rubino's departure, another female employee at the University came forward with accusations that Rubino had sexually harassed her for a number of years. (FAC ¶ 16.) Plaintiff was instrumental in bringing this claim to the attention of Trautman and Dr. Thomas Ostrowski, then Provost of Gannon. (*Id.*)

Following Rubino's resignation in May of 2000, Gannon engaged in a campaign to cover-up Rubino's sexual misconduct at the insistence of Trautman. (FAC ¶ 17.) Plaintiff was vocal in opposing this and other of the Administration's policies and procedures which she viewed as discriminatory toward females. (FAC ¶ 64.) One such policy was Trautman's willingness to allow allegedly abusive clergy to remain on campus, including at least one former Gannon priest who had been removed because of sexual misconduct directed at students. (FAC ¶¶ 31, 64.) Plaintiff also strongly opposed the University's efforts, during the time that Rubino was coming under investigation for alleged sexual harassment of females, to limit the time frame within which victims of sexual harassment could file grievances. (FAC ¶ 65.) Moreover, as Chair of the University's Institutional Integrity Committee, Plaintiff was instrumental in submitting a Middle States accreditation report which raised issues of gender-based inequality in the pay of Gannon's female employees and which was critical of the University's policies and procedures for addressing complaints of sexual harassment and other forms of discrimination. Despite pressure from the University's administration,

Plaintiff refused to change those portions of the report which were critical of the University. (FAC ¶¶ 66–68.)

Plaintiff contends that, in retaliation for the foregoing conduct and because of her gender, she was discriminated against in the terms and conditions of her employment. In essence, Plaintiff avers that— while nominally retaining the title of University Chaplain—she was demoted in several respects, *to wit:*

   * she was removed from her status as a member of the President's staff;

   * her position as head of the Chaplain Division was unilaterally restructured at the behest and direction of Trautman such that she was placed under Rouch's supervision when the latter was appointed to the newly created Vice President for Mission and Ministry;

   * many of the responsibilities and important decisions traditionally made by the University Chaplain—including those involving liturgical planning and/or impacting the University's Catholic identity—were taken from Plaintiff and were reassigned either to Garibaldi or Rouch; and

   * in a meeting with Garibaldi on April 18, 2002 Plaintiff was instructed to limit her comments when she was invited to speak at University events as Chaplain.

Trautman's decision to appoint Rouch as Vice President for Mission and Ministry, with supervisory power over Plaintiff, was contrary to both the University's bylaws, which vested power to create new academic or non-academic positions with the President of the University (not the Chair of the Board), and the University's policy at the time of reducing the number of top level administration positions. (FAC ¶ 20.) Moreover, Trautman created this position without any input from the University or

its administration and without any determination by the University's then-interim President, Dr. Ostrowski, that there was a need for the position. (*Id.*) In fact, Plaintiff alleges that Dr. Ostrowski repeatedly broached with her the possibility of Plaintiff accepting another position within the University, stressing that Trautman and Rouch would never let her remain Chaplain because of her gender. (FAC ¶¶ 21, 24.)

Upon beginning his term as University President, Defendant Garibaldi effectuated the plan of restructuring Plaintiff's employment so as to remove her from the President's staff and place the Chaplain's Division under the supervision of Rouch. (FAC ¶¶ 27–29, 36–37.) Contrary to the mandates of the University's Governance Manual, this "restructuring" was carried out without first being presented to the President's Council for consultation and approval. (FAC ¶ 37.)

Rouch subsequently contacted Plaintiff for the purpose of discussing the restructuring. Plaintiff declined meeting with Rouch on the ground that she first wanted to meet with Garibaldi to address her concerns about the perceived gender discrimination. (FAC ¶¶ 40–46.) Garibaldi declined Plaintiff's invitation for a meeting and advised her that if she did not report to Rouch, the University would take "appropriate action," which Plaintiff understood to mean the termination of her employment. (FAC ¶ 47.)

Believing that she was about to be fired, Plaintiff served Gannon with two weeks notice of her resignation on October 14, 2002. (FAC ¶ 48.) Plaintiff was advised the following day that her resignation was accepted effective immediately and that she was to pack her belongings and leave the campus. Her access to the campus and to students was strictly limited there-

after. (FAC ¶ 49.) Following Plaintiff's departure, Rouch stated on several occasions to both students and staff that a female would not be considered to replace Plaintiff as Chaplain. (FAC ¶ 53.)

After exhausting her administrative remedies with the EEOC, Plaintiff commenced this action. Her First Amended Complaint asserts six distinct theories of recovery. Count One asserts a claim of gender discrimination under Title VII against all Defendants. Count Two asserts a Title VII claim for retaliatory discrimination against all Defendants. Count Three asserts claims against Gannon, Rubino and Trautman for fraudulent misrepresentations relative to her hiring and appointment as University Chaplain. Count Four asserts claims of civil conspiracy against Trautman, Garibaldi and Rouch relative to their alleged Title VII violations. Count Five alleges claims against Gannon and Garibaldi for breach of contract. Count Six alleges claims against Gannon and its Board for negligent supervision and retention of Trautman as Chair of the Board, Garibaldi as President, and Rouch as Part-time Vice Present of the University.

Defendants have moved to dismiss all claims on the ground that they are barred by the so-called "ministerial exception," which is frequently applied in employment discrimination cases involving religious institutions. The issues have been briefed, argued, and are ripe for disposition.

### III. DISCUSSION

■ The ministerial exception is rooted in the First Amendment which provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof ..." U.S. CONST. AMEND. I. It is axiomatic that these proscriptions on government authority extend to the judicial branch as well as the legislative branch. *See Kreshik v. Saint Nicholas Cathedral,* 363 U.S. 190, 191, 80 S.Ct. 1037, 4 L.Ed.2d 1140 (1960).

■ Among the prerogatives protected by the Free Exercise Clause is the right of religious institutions to manage their internal affairs. *See Kedroff v. St. Nicholas Cathedral of the Russian Orthodox Church in North America,* 344 U.S. 94, 116, 73 S.Ct. 143, 97 L.Ed. 120 (1952) (Free Exercise Clause protects the power of religious organizations "to decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine."). The Supreme Court has been particularly deferential in matters involving the church's selection of its own clergy. *See, e.g., Gonzalez v. Roman Catholic Archbishop of Manila,* 280 U.S. 1, 16, 50 S.Ct. 5, 74 L.Ed. 131 (1929) ("it is the function of the church authorities to determine what the essential qualifications of a chaplain are and whether the candidate possesses them"); *Serbian Eastern Orthodox Diocese v. Milivojevich,* 426 U.S. 696, 717, 96 S.Ct. 2372, 49 L.Ed.2d 151 (1976) ("questions of church discipline and the composition of church hierarch are at the core of ecclesiastical concern.").

■ The Establishment Clause prohibits laws "respecting an establishment of religion." U.S. CONST. AMEND I. In *Lemon v. Kurtzman,* 403 U.S. 602, 612–13, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971), the Supreme Court held that a statute comports with the Establishment Clause if it has a secular legislative purpose, if its principal or primary effect neither advances nor inhibits religion, and if it does not foster an "excessive government entanglement with religion." Unconstitutional entanglement with religion may arise in situations "where a 'protracted legal process pit(s) church and state as adversaries,' ... and

where the Government is placed in a position of choosing among 'competing religious visions.'" *EEOC v. Catholic University of America,* 83 F.3d 455, 465 (D.C.Cir.1996) (internal and end citations omitted).

Consistent with these principles, a number of circuit courts of appeals have held that the First Amendment precludes courts from adjudicating employment discrimination suits between church and minister. Among the first decisions involving Title VII was *McClure v. The Salvation Army,* 460 F.2d 553 (5th Cir.1972), a case in which the plaintiff, Billie B. McClure, an ordained minister in the Church of the Salvation Army, sued the Church under Title VII, alleging that she had received less salary and fewer benefits than similarly situated male officers and that she had been discharged because of her complaints relative to these practices. The Fifth Circuit Court of Appeals was confronted with the issue whether application of Title VII in McClure's case would violate First Amendment principles. Quoting from *Sherbert v. Verner,* 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963) and *West Virginia State Bd. of Education v. Barnette,* 319 U.S. 624, 63 S.Ct. 1178, 87 L.Ed. 1628 (1943), the court observed that it is only in the rarest of occasions—e.g., where there is a need to prevent the "gravest abuses, endangering paramount [state] interests"—that government-imposed limitations on the free exercise of religion can be upheld. 460 F.2d at 558. Regarding matters of employment, the court noted that:

> [t]he relationship between an organized church and its ministers is its lifeblood. The minister is the chief instrument by which the church seeks to fulfill its purpose. Matters touching this relationship must necessarily be recognized as of prime ecclesiastical concern. Just as the initial function of selecting a minister is a matter of church administration

and government, so are the functions which accompany such a selection.

460 F.2d at 558–59. The Church's practices relative to its ministers' assignments, salaries, and duties, the court concluded, were "matters of church administration and government and thus, purely of ecclesiastical cognizance." *Id.* at 560. The court found that application of Title VII to McClure's case would necessarily involve an investigation and review of these practices which, in turn, would result in state interference in matters of church administration and government—"matters of a singular ecclesiastical concern"—and threaten the separation of church and state contemplated by the Establishment Clause. *Id.* Despite these concerns, the court determined it need not rule on this constitutional issue because, it held, Congress did not intend the statute to regulate the employment relationship between church and minister. *Id.* at 560–61.

Several other circuit courts of appeals have since applied this exception to cases involving employment disputes between church and minister. *See, e.g., Werft v. Desert Southwest Annual Conference of the United Methodist Church,* 377 F.3d 1099, 1104 (9th Cir.2004) (minister's claims under Title VII, the Rehabilitation Act of 1978, the Americans with Disabilities Act of 1990, and the Arizona Civil Rights Act, all of which were grounded in the church's alleged failure to accommodate minister's disabilities, were part of the employment relationship between church and minister and were therefore properly dismissed under the ministerial exception); *Alicea–Hernandez v. Catholic Bishop of Chicago,* 320 F.3d 698, 703–04 (7th Cir.2003) (court lacked subject matter jurisdiction to address Title VII gender discrimination claims raised by plaintiff with ministerial duties); *Gellington v. Christian Methodist Episcopal Church, Inc.,* 203 F.3d 1299,

1304 (11th Cir.2000) (minister's Title VII claims that he was retaliated against and constructively discharged as a result of assisting a female minister in her sexual harassment complaint was barred by Free Exercise Clause and Establishment Clause); *Catholic University of America*, 83 F.3d at 461 (First Amendment precluded judicial review of nun's Title VII gender discrimination and retaliation claims which were premised on the denial of her application for tenure in religious university's Department of Canon Law); *Lewis v. Seventh Day Adventists Lake Region Conference*, 978 F.2d 940, 942 (6th Cir.1992) (affirming dismissal of minister's breach of contract and promissory estoppel claims on First Amendment grounds); *Scharon v. St. Luke's Episcopal Presbyterian Hosps.*, 929 F.2d 360, 363 (8th Cir.1991) (court's adjudication of hospital chaplain's Title VII and age discrimination claims was barred by First Amendment); *Natal v. Christian and Missionary Alliance*, 878 F.2d 1575, 1577 (1st Cir.1989) (affirming dismissal of clergyman's wrongful termination claim based upon Free Exercise clause); *Rayburn v. General Conf. of Seventh–Day Adventists*, 772 F.2d 1164 (4th Cir.1985) (plaintiff's Title VII challenge to denial of pastoral appointment was barred by religion clauses of First Amendment).

■ The ministerial exception "does not apply solely to the hiring and firing of ministers, but also relates to the broader relationship between an organized religious institution and its clergy." *Werft*, 377 F.3d at 1103. In fact, *any matters* "touching this relationship" are necessarily considered "as of prime ecclesiastical concern." *McClure*, 460 F.2d at 559. Issues such as a minister's salary, place of assignment; and the duty he is to perform in furtherance of the religious mission of the church are all matters "touching" the church-minister relationship. *Id.*

■ While the Third Circuit Court of Appeals has not formally adopted the ministerial exception in an employment discrimination case, we predict that it would apply the exception in appropriate circumstances. In *Little v. Wuerl*, 929 F.2d 944 (3d Cir.1991), the Third Circuit observed that the right to freely exercise one's religion is "guaranteed not only to individuals but also to churches in their collective capacities, which must have 'power to decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine.'" 929 F.2d at 947 (citing *Rayburn, supra,* at 1167). Continuing, the court recognized that other federal courts "[r]elying on this basic principle ... have consistently found that Title VII does not apply to the relationship between ministers and the religious organizations that employ them, even where discrimination is alleged on the basis of race or sex." *Id.* (citing *McClure, supra* and *Rayburn, supra* ).

*Little* did not involve application of the ministerial exception; rather, it involved the generally recognized right of religious institutions to discriminate on the basis of religion against both ministerial and non-ministerial employees alike. In *Little*, a non-Catholic teacher formerly employed at a Catholic school claimed that the school engaged in religious discrimination against her in violation of Title VII when, as a result of her remarriage, it failed to renew her contract. In addressing the viability of Little's claim, the court applied the teachings of *N.L.R.B. v. Catholic Bishop of Chicago*, 440 U.S. 490, 99 S.Ct. 1313, 59 L.Ed.2d 533 (1979), and framed the following inquiries: (1) whether applying Title VII to the Parish's decision in Little's case would raise substantial constitutional questions and, if it would, (2) whether Congress clearly expressed an intent that Title VII be applied to this kind of decision. 929

F.2d at 947. The court answered the first inquiry affirmatively, finding that application of Title VII's prohibition of religions discrimination to Little's case would raise "serious constitutional questions" under both the Free Exercise and Establishment Clauses. *Id.* at 949. However, the court addressed the second inquiry in the negative, concluding that there was no indication Congress affirmatively intended Title VII to apply to situations, like that of Little, in which "a parochial school [discharges] a Catholic or non-Catholic teacher who has publicly engaged in conduct regarded by the school as inconsistent with its religious principles." *Id.* at 951. The *Little* Court thus held that Little's claims lacked viability under Title VII, but not for reasons involving the ministerial exception.

In *Geary v. Visitation of the Blessed Virgin Mary Parish School,* 7 F.3d 324 (3d Cir.1993), the Third Circuit addressed a lay teacher's claim that she was dismissed by a church-operated elementary school on the basis of her age, in violation of the Age Discrimination in Employment Act, and that her health benefits were canceled in retaliation for having filed the ADEA suit. Like the court in *Little,* the *Geary* Court employed the inquiry set forth in *Catholic Bishop.* However, the *Geary* Court concluded its analysis at the first prong, determining that application of the ADEA in Geary's case would not present a significant risk of infringing First Amendment rights. Given the limited scope of inquiry involved in Geary's ADEA claim and the fact that the school had proffered no religious doctrine in support of her termination and loss of health benefits, the court concluded that application of the ADEA to the lay faculty of a religious school would not present a significant risk of entanglement. The court explained that "when the pretext inquiry neither traverses questions of the validity of religious beliefs nor forces a court to choose between parties'

competing religious visions, that inquiry does not present a significant risk of entanglement." *Id.* at 330. The Court contrasted situations where "the employee who challenges an employment decision is a member of the clergy," noting that "some courts have refused to allow even this limited inquiry into pretext." *Id.* (citing *Scharon v. St. Luke's Episcopal Presbyterian Hosps., supra* ). However, the court concluded that the ministerial exception was inapplicable to Geary:

> notwithstanding Geary's apparent general employment obligation to be a visible witness to the Catholic Church's philosophy and principles, a court could adjudicate Geary's claims without the entanglement that would follow were employment of clergy or religious leaders involved. *Compare DeMarco [v. Holy Cross High School],* 4 F.3d [166, 172 (2d Cir.1993)] (distinguishing case in which employer/employee relation is so pervasively religious that no pretext inquiry can be made without offending First Amendment, and case in which references to employee's religious inadequacy are limited to very specific, testable allegations).

7 F.3d at 331.

We read *Little* and *Geary* as at least tacit acknowledgment by our Circuit Court of Appeals that it would apply the ministerial exception in appropriate circumstances. This, of course, begs the question whether the instant case presents "appropriate circumstances."

█ Plaintiff maintains that the exception is inapplicable to her case because, she insists, she is not a "minister." Plaintiff points out that, under Roman Catholic Canonical law, only ordained priests can be chaplains or ministers, and only males can be ordained priests. According to Petruska, "[i]t is somewhat hypocritical of the

church affiliated defendants to argue that Petruska is a minister and a chaplain, when their church hierarchy would claim that she is neither." (Pl.'s Amended Br. in Opp. to Def.s' Mot. to Dismiss [Doc. No. 58]at p. 11.) Be that as it may, the question whether an individual is a "minister" for purposes of the ministerial exception is a matter determined by federal common law, not ecclesiastical law, and federal courts have endorsed a functional approach to this inquiry. *See Alicea–Hernandez,* 320 F.3d at 703–04 ("In determining whether an employee is considered a minister for the purposes of applying this exception, we do not look to ordination but instead to the function of the position"; plaintiff's duties as press secretary for Archdiocese of Chicago were ministerial in nature where plaintiff was integral in shaping the message that the Church presented to the Hispanic community); *Catholic University of America,* 83 F.3d at 457 ("The ministerial exception encompasses all employees of a religious institution, whether ordained or not, whose primary functions serve its spiritual and pastoral mission.")(nun's role as professor within Catholic University's Department of Canon Law was the functional equivalent of a minister despite the fact that she was not ordained by the Catholic Church); *Rayburn,* 772 F.2d at 1169 (ministerial exception applies to lay employees of religious institutions whose "primary duties consist of teaching, spreading the faith, church governance, supervision of a religious order, or supervision or participation in religious ritual and worship"; if their positions are "important to the spiritual and pastoral mission of the church" they should be considered "clergy") (internal quotation marks and citations omitted); *EEOC v. Southwestern Baptist Theological Seminary,* 651 F.2d 277, 283 (5th Cir. 1981) (non-ordained faculty at Baptist seminary would be considered "ministers"

where no course has a "strictly secular purpose").

■ Plaintiff's allegations establish that she was appointed to the position of University Chaplain on July 1, 1999. (FAC ¶ 1.) While Plaintiff, as Chaplain, initially served as head of the Chaplain's Division, she was subsequently placed under the supervision of the Vice President for Mission and Ministry, headed by Defendant Rouch. (*Id.* at ¶¶ 1, 20, 37.) Her employment responsibilities included serving as co-chair of Gannon's Catholic Identity Task Force, thereby giving her input into "issue[s] impacting the Catholic identity of the University," until Garibaldi allegedly undermined her involvement in these issues. (*See id.* at ¶ 28) Plaintiff also held prayer services as Chaplain and was traditionally involved in the planning of liturgies. (FAC ¶ 29, 36.) Petruska's June 2002 performance evaluation, which is appended to her First Amended Complaint, indicates that "[t]he office of the Chaplin has primarily worked with students and the Catholic Identity Task Force in student development and mission-focused activities." (FAC [Doc. No. 49] at Ex. 1, p. 2.) Other comments indicate that the "major events" of the Chaplain's Office include liturgies and service trips, among other things. (*Id.*) Her "performance objectives" for the next review period were as follows:

1. More regular meetings w[ith] [the University] President to keep him abreast of issue [sic] and concerns [and] to discuss issues more thoroughly before presentation to [the] broader constituency[;]

2. Continue to develop strategies to increase participation in [the] sacramental life of [the] Gannon community[;]

3. Increase involvement of [the] Catholic Identity Task Force in promoting [the] Catholic Identity of [the] Universi-

ty [and] discussion of Gannon's mission[;]

4. Continue to develop faculty [and] staff as partners in ... [the] sacramental/ spiritual mission of [the] University[.]

(*Id.* at p. 3.)[2]

While Petruska downplays the ministerial nature of her prior job responsibilities and cites her involvement in various secular job-related activities, it is evident from her own allegations that, as University Chaplain, she was instrumental in implementing Gannon's Catholic mission and actively involved in communicating that message to a broad lay constituency. Her own allegations and submissions suggest that her primary duties included, *inter alia,* "spreading the [Catholic] faith" and "supervisi[ng] or participati[ng] in religious ritual and worship." *See Rayburn,* 772 F.2d at 1169. Given the importance of Petruska's role *vis-a-vis* the spiritual and pastoral mission of the University, *see Catholic University of America,* 83 F.3d at 457 and *Rayburn,* 772 F.2d at 1169, she must be considered a "ministerial" employee.

Nor is it significant that Gannon has not asserted a religious basis for the challenged employment actions, for "[t]he focus under the ministerial exception is on the action taken [by the employer], not possible motives." *Catholic University of America,* 83 F.3d at 465. Indeed, "[t]he exception precludes any inquiry whatsoever into the reasons behind a church's ministerial employment decision." *EEOC v. Roman Catholic Diocese of Raleigh, N.C.,* 213 F.3d 795, 802 (4th Cir.2000). "The church need not, for example, proffer any religious justification for its decision, for the Free Exercise Clause 'protects the act of a decision rather than a motivation behind it.'" *Id.* (quoting *Rayburn, supra,* 772 F.2d 1164, 1169 (4th Cir.1985)). *See also Werft,* 377 F.3d at 1103 ("it is the decision itself which is exempt—the courts may not even look into the reasoning"); *Alicea–Hernandez,* 320 F.3d at 703 ("It is ... not our role to determine whether the Church had a secular or religious reasons for the alleged mistreatment of Alicea–Herenandez. The only question is that of the appropriate characterization of her position."); *Bollard v. California Province of the Society of Jesus,* 196 F.3d 940, 946 (9th Cir.1999) ("[T]he ministerial relationship lies so close to the heart of the church that it would offend the Free Exercise Clause simply to require the church to articulate a religious justification for its personnel decision."); *Rayburn,* 772 F.2d at 1169 ("In these sensitive areas, the state may no more require a minimum basis in doctrinal reasoning than it may supervise doctrinal content."); *Patsakis v. Greek Orthodox Archdiocese of America,* 339 F.Supp.2d 689, 697 n. 1 (W.D.Pa.2004) ("[T]o delve into the reasons for Patsakis' termination before deciding whether she is a 'minister' would enmesh the court in the very investigation and review of church matters that

---

**2.** We also note, by way of further example, the advertisement which Gannon placed in the National Catholic Reporter in May of 2001 to solicit applicants for the position of Director of Catholic Campus Ministry. (*See* Ex. 1–A to Pl.'s Third Motion to Submit and consider Documents in Supp. of Pl's Amended Br. in Opp. to All Def.s' Motions to Dismiss [Doc. No. 63].) It appears to be undisputed that the Office of Campus Ministry was an office within the Chaplain's Division during Plaintiff's tenure such that Plaintiff would have had ultimate supervisory authority over the Campus Ministry Director. The advertisement notes that the Director of Catholic Campus Ministry is responsible for "designing, developing and coordinating religious services, programs and pastoral counseling that pertains to advancing the faith life, spiritual welfare and apostolic formation of the Gannon community." (*Id.*)

the ministerial exception was designed to prevent."). In sum, Petruska's observation that Gannon has not posited a religious motivation for the challenged employment action is of no legal moment.

Petruska also suggests that the ministerial challenge does not survive the Supreme Court's decision in *Employment Division, Dept. of Human Resources of Oregon v. Smith*, 494 U.S. 872, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990). In *Smith*, the Supreme Court held that the Free Exercise Clause did not require the State of Oregon to permit an exception, based on the religious use of peyote, from the general criminal prohibition on the use of the drug. In so holding, the Court explained that "the right of free exercise does not relieve an individual of the obligation to comply with a valid and neutral law of general applicability on the ground that the law proscribes ... conduct that his religion prescribes ..." *Id.* at 879, 110 S.Ct. 1595.

However, numerous federal courts of appeals have rejected the argument that *Smith* somehow undermines the ministerial exception. *See Roman Catholic Diocese*, 213 F.3d at 800 n. *; *Gellington*, 203 F.3d at 1303; *Combs v. Central Texas Annual Conf. of United Methodist Church*, 173 F.3d 343, 350 (5th Cir.1999); *Catholic University of America*, 83 F.3d at 462–63. *Accord Bryce v. Episcopal Church in the Diocese of Colorado*, 289 F.3d 648, 656 (10th Cir.2002) (applying the rationale of these cases and finding that the church autonomy doctrine similarly remains viable after *Smith*). As the Eleventh Circuit Court of Appeals has succinctly explained:

> The *Smith* decision focused on the first type of government infringement on the right of free exercise of religion—infringement on an individual's ability to observe the practices of his or her religion. The second type of government infringement—interference with a church's ability to select and manage its own clergy—was not at issue in *Smith*. The Court's concern in *Smith* was that if an individual's legal obligations were contingent upon religious beliefs, those beliefs would allow each individual " 'to become a law unto himself.' " ... The ministerial exception does not subvert this concern; it was not developed to provide protection to individuals who wish to observe a religious practice that contravenes a generally applicable law. Rather, the exception only continues a long-standing tradition that churches are to be free from government interference in matters of church governance and administration. .... Also, because the ministerial exception is based on this tradition and not on strict scrutiny, the Court's rejection in *Smith* of the compelling interest test does not affect the continuing vitality of the ministerial exception.

*Gellington*, 203 F.3d at 1303–04. We find the foregoing authority persuasive and therefore hold that *Smith* does not undermine the viability of the ministerial exception.

■ Petruska also asserts several theories as to why this Court should consider the "ministerial exception" waived for present purposes. She contends, for example, that the Defendants have waived the exception by failing to expressly raise it during EEOC proceedings.

However, several courts have ruled that a defendant's failure to invoke a defense during EEOC proceedings does not necessarily waive the defense for purposes of district court proceedings. *See, e.g., McGinty v. New York*, 251 F.3d 84, 93–94 (2d Cir.2001) (failure of state defendants to raise Eleventh Amendment immunity as a defense in EEOC proceedings did not constitute a "waiver of immunity" in a subse-

quent federal court action under the ADEA); *Brennan v. King*, 139 F.3d 258, 263 (1st Cir.1998) (failure of university to invoke professor's refusal to arbitrate discrimination claims within university's internal appeals process as defense to plaintiff's charges before the EEOC did not constitute a waiver of the defense in district court proceedings); *Cook v. Union Camp Corp.*, No. CIV. A.1:95CV140–S–D, 1996 WL 407549 at *3 (N.D.Miss. April 4, 1996) (defendant's failure to have raised the 180–day limitation defense before the EEOC did not waive its right to assert the defense in federal court); *Byrnes v. Herion Inc.*, 757 F.Supp. 648, 653 (W.D.Pa. 1990) (failure to raise limitations defense at EEOC level did not constitute waiver in federal court action). Although courts charged with reviewing determinations of another tribunal will not ordinarily consider issues not raised in the earlier proceedings, "that truism is without application here since it [is] no part of the responsibility of the district court to review the determinations of the EEOC." *Brennan*, 139 F.3d at 263. Accordingly, we are not persuaded that Defendants' failure to argue the ministerial exception before the EEOC waives the defense for present purposes.

Alternatively, Petruska contends that the ministerial exception has been waived by Gannon's representations that it is an equal opportunity employer and that it does not discriminate against students on the basis of (among other things) gender—representations which, according to Plaintiff, Gannon makes in order to remain eligible for public funding. A similar argument was raised and rejected by the court in *EEOC v. Southwestern Baptist Theological Seminary*, 485 F.Supp. 255 (N.D.Texas 1980), *aff'd in part and rev'd in non-relevant part*, 651 F.2d 277 (5th Cir.1981). That case involved a suit by the EEOC to

establish jurisdiction over the defendant seminary and to compel certain reporting requirements under Title VII of the Civil Rights Act. The seminary had refused to submit to the reporting requirements on the grounds that, because of the allegedly "ministerial" status of its faculty and administrators, it was protected from Title VII enforcement by the religious clauses of the First Amendment. The EEOC argued that any free exercise objections that the seminary might have relative to the enforcement of Title VII had been waived by the seminary's conduct in seeking and maintaining its status as an approved program of education for veterans receiving educational benefits, and thereby subjecting itself to enforcement of similar prohibitions contained in Title VI. The district court disagreed and observed that coverage under Title VI of the Act is independent of coverage under Title VII. As the court noted, "Title VI forbids only discrimination by a recipient of federal funds against the participants in (or beneficiaries of) a federally assisted program conducted by the recipient, regardless of whether or not the participant or beneficiary is an employee." 485 F.Supp. at 261 (citing 42 U.S.C. § 2000d). Thus, "[i]f Title VII also applies, it will do so by its own terms and not by virtue of the employer's status as a recipient of federal funds under Title VI." *Id.* at 262. Noting that "[w]aivers of important constitutional rights must generally be knowing and intelligent and consents to their violation must be strictly construed," and unable to find any lack of good faith in the seminary's assertion of religious objections to the enforcement of Title VII, the district court "decline[d] to hold that acceptance of veterans receiving federal assistance constitutes a waiver of religious objections to the more comprehensive and intrusive enforcement possible

under Title VII." *Id.* at 262–63.[3]

Plaintiff refers us to the case of *Erie Telecommunications, Inc. v. City of Erie*, 853 F.2d 1084 (3d Cir.1988), among others, in support of the proposition that First Amendment rights can be waived. In *Erie Telecommunications*, the plaintiff, a cable operator, challenged certain franchise and access agreements into which it had entered with the City of Erie on the ground that the agreements violated the plaintiff's first amendment right of free expression. The Third Circuit held that the plaintiff's claims were barred by virtue of a release which the plaintiff had signed in the settlement of prior litigation brought by one of its competitors. The release contained language acknowledging that the challenged franchise agreement was "valid, binding and of full force and effect," and it released the City of Erie from "any and all claims ... relating to ... the Franchise." *See* 853 F.2d at 1086. The court found that this language barred the plaintiff's "free expression" claims: "... ETI, by executing a broad and general release in January 1984, knowingly, voluntarily, and intelligently relinquished any constitutional causes of action which it must have known could be asserted against the City." 853 F.2d at 1101. As is readily apparent, *Erie Telecommunications* did not address the circumstances, if any, under which a religious institution may waive application of the ministerial exception and its holding is therefore of limited assistance here.[4]

Contextually more relevant is Plaintiff's citation to *Welter v. Seton Hall University*, 128 N.J. 279, 608 A.2d 206 (1992), a case in which two nuns who had been discharged from their teaching positions in Seton Hall's computer science department brought successful claims for breach of contract after the University failed to give them terminal-year contracts. In upholding the plaintiffs' verdict, the New Jersey Supreme Court held that the nuns were not ministerial employees and that, because the dispute implicated neither doctrinal issues nor issues of church policy, the trial court properly exercised jurisdiction over the claims. The court acknowledged the jurisdictional limitation which

3. On appeal, the Fifth Circuit affirmed the district court in part and reversed and remanded in non-relevant part. The Court of Appeals held that enforcement of Title VII was precluded with respect to the employment relationship between the seminary and its faculty; however, it found no First Amendment proscription against enforcement of Title VII relative to the seminary's non-ministerial administrative staff and support personnel. *See EEOC v. Southwestern Baptist Theological Seminary*, 651 F.2d 277 (5th Cir. 1981). The district court's ruling concerning the seminary's lack of waiver of any First Amendment protection was apparently not challenged on appeal, as it was not addressed in the Fifth Circuit's opinion.

4. Plaintiff's other cited cases are similarly inapposite. *See, e.g., Ferrill v. The Parker Group, Inc.*, 168 F.3d 468 (in suit brought under 42 U.S.C. § 1981 by African–American employee of telephone marketing firm, defendant waived its argument that its race-based assignment of "get out the vote" calls was protected political speech under the First Amendment by failing to assert it before the district court); *United States v. Berke*, 170 F.3d 882 (9th Cir.1999) (defendant who entered into consent agreement as part of a plea agreement i n criminal case involving violations of federal obscenity laws knowingly and voluntarily waived his First Amendment rights relative to prohibitions on his involvement in the production, sale, or distribution of otherwise non-obscene materials); *Jackson/Charvel, Inc. v. Gibson Guitar Corp.*, 863 F.2d 48 (6th Cir.1988) (Table Case published at 1988 WL 123494) (consent decree operated to waive defendant's due process right to litigate certain issues); *Wilkicki v. Brady*, 882 F.Supp. 1227 (D.R.I.1995) (plaintiff, in entering settlement agreement to withdraw charges made to town council, knowingly, voluntarily and intelligently waived his First Amendment rights).

arises in employment cases involving "ministerial" employees, noting that the limitation is premised on the "sound proposition that to interfere with a religious employer's choices regarding who may propagate the faith or who may train others to do so is to entangle the judiciary impermissibly in matters of polity." 608 A.2d at 214. The court "hasten[ed] to add," however, "that religious institutions are free to bargain away the right to unimpeded discretion in deciding which persons are most qualified to minister the religion or to train those who will eventually minister the faith." *Id.* at 214. The court explained that "[a] cursory judicial review of the employment manual or contract to determine whether the ministerially-functioning employee and the religious institution expressly included such a waiver will not transgress the First Amendment." *Id.* Seizing upon this language, Petruska contends that "the tribunals agreed upon by [the Defendants and herself] were the EEOC and now this court when Gannon represented itself as an equal opportunity employer and Plaintiff accepted employment based upon such representations." (Pl.'s Mem. of Law in Supp. of the Position Taken and Supported in Pl.'s Third Mot. to Submit and Consider Documents [Doc. No 67] at p. 6.)

Whether, and to what extent, a religious institution can waive application of the ministerial exception is a point unrefined by existing case law. Defendants refer us to *Hall v. Baptist Mem. Health Care Corp.*, 215 F.3d 618 (6th Cir.2000), *Little v. Wuerl*, *supra,* and *Siegel v. Truett–McConnell College, Inc.,* 13 F.Supp.2d 1335 (N.D.Ga.1994), *aff'd,* 73 F.3d 1108 (11th Cir.1995) (TABLE, NO. 94–9376), for the proposition that, as a matter of law, a religious institution such as Gannon cannot waive the protections of the ministerial exception. However, those cases all involved situations in which a religious institution had engaged in religious discrimination against an employee—a privilege which is the subject of an express statutory exemption within Title VII. *See Hall,* 215 F.3d at 624 ("The decision to employ individuals 'of a particular religion' under § 2000e–1(a) and § 2000e–2(e)(2) has been interpreted to include the decision to terminate an employee whose conduct or religious beliefs are inconsistent with those of its employer.") (citing *Little v. Wuerl, supra,* at 951 and *Killinger v. Samford Univ.,* 113 F.3d 196, 198 (11th Cir.1997)). As the Sixth Circuit Court of Appeals explained in *Hall:*

> ... the statutory exemptions from religious discrimination claims under Title VII cannot be waived by either party. *Little,* 929 F.2d at 951; *Siegel,* 13 F.Supp.2d at 1345. The exemptions reflect a decision by Congress that religious organizations have a constitutional right to be free from government intervention. *Id.* "Once Congress stated that '[t]his title shall not apply' to religiously-motivated employment decisions by religious organizations," neither party could expand the statute's scope. *Siegel,* 13 F.Supp.2d at 1345 (quoting *Little,* 929 F.2d at 951).

215 F.3d at 625.

██ Like Plaintiff, we question the applicability of this logic in the case at bar. Unlike Title VII's exemption for religious institutions engaging in religious discrimination, the ministerial exception is not a doctrine borne of any express statutory exemption. Instead, it is a judicially created doctrine which arises from well-recognized First Amendment principles and which exists quite independent of Title VII or any other statute. *See, e.g., Shaliehsabou v. Hebrew Home of Greater Washington, Inc.,* 363 F.3d 299, 306 (4th Cir.2004) (ministerial exception applied in Title VII cases is based on constitutional principles

and not on congressional debate or administrative guidelines), *reh'g en banc denied*, 369 F.3d 797 (4th Cir.2004). Therefore, we are not persuaded that *Hall, Little*, and *Siegel* dispose of Plaintiff's waiver argument.

■ On the other hand, we note that the ministerial exception partakes of jurisdictional qualities, as it implicates constitutionally mandated restraints on this Court's power to adjudicate certain types of employment disputes. *See Roman Catholic Diocese of Raleigh, North Carolina*, 213 F.3d at 800 (the ministerial exception is a "constitutionally compelled limitation on civil authority [and] ensures that no branch of secular government trespasses on the most spiritually intimate grounds of a religious community's existence"). *See also Patsakis*, 339 F.Supp.2d at 692–93 ("The propriety of asserting the 'ministerial exception' defense through a 12(b)(1) motion, as defendants have done here, is well-established.") (citing cases). Generally, issues bearing on a district court's subject matter jurisdiction are not capable of being waived. *See Kontrick v. Ryan*, 540 U.S. 443, 124 S.Ct. 906, 157 L.Ed.2d 867 (2004) (subject matter jurisdiction may be raised initially by either party, or sua sponte by the court, at any stage of litigation, including appeal). Viewed in this light, the viability of Plaintiff's waiver argument seems more dubious.

■ Assuming only for the sake of argument that the doctrine of waiver is applicable in the ministerial exception context, we find that there is no factual basis in the record to warrant its application here. Waivers of constitutional rights must be voluntary, knowing, and intelligent, must be established by "clear" and "compelling" evidence, and must be strictly construed. *Erie Telecommunications, Inc.*, 853 F.2d at 1094–95 (citations omit-

ted) (waiver involves the "intentional relinquishment of a known right or privilege," and the Supreme Court has admonished lower courts to " 'indulge in every reasonable presumption against waiver' " and " '[not] presume acquiescence in the loss' of such rights.") (quoting *Johnson v. Zerbst*, 304 U.S. 458, 464, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938)). Even accepting as true all of the averments proffered by Plaintiff in her Amended Complaint and submissions to the Court in opposition to the instant motions, we find nothing that would give rise to a genuine issue of waiver in this case. In our view, as a matter of law, Gannon's pronouncements on various occasions that it would voluntarily conform to the principle of nondiscrimination does not amount to a clear and unambiguous waiver of Gannon's right to assert in this litigation a First Amendment challenge to this Court's subject matter jurisdiction.

■ Having concluded that Petruska performed a "ministerial" function during her tenure at Gannon, and having also concluded that the Defendants have not waived the right to assert the "ministerial exception" doctrine in this litigation, we must further conclude that the exception precludes us from exercising jurisdiction over the claims in Plaintiff's First Amended Complaint. A determination of "whose voice speaks for the church is *per se* a religious matter." *Minker v. Baltimore Annual Conference of the United Methodist Church*, 894 F.2d 1354, 1356 (D.C.Cir. 1990). Thus, our resolution of any claims "touching" on the church-minister relationship—i.e., assignment of duties, pay, termination, etc.—are necessarily matters of "prime ecclesiastical concern" into which we may not delve. *McClure*, 460 F.2d at 558–59. Plaintiffs' complaints that, because of her gender and because of Gannon's desire to retaliate against her, she was effectively demoted, deprived of vari-

ous ministerial responsibilities, and ultimately forced to resign from her position as Chaplain all implicate the University's prerogative to make unfettered employment decisions concerning one of its ministers. Unfortunately for Plaintiff, it matters not whether Gannon's decisions were wise, misguided, or otherwise in compliance with Title VII. Under the ministerial exception, it is the decision itself which is exempt from review and, consequently, we may not examine the reasons behind it. *See Werft*, 377 F.3d at 1103; *Alicea–Hernandez*, 320 F.3d at 703.

Plaintiff refers us to *McKelvey v. Pierce*, 173 N.J. 26, 800 A.2d 840 (2002), for the proposition that courts must analyze the applicability of the ministerial exception on a claim-by-claim basis. *See id.*, 800 A.2d at 858–59 (holding that former seminarian, who was the victim of alleged sexual harassment, was not barred as a matter of law from bringing action against diocese and several priests for breach of contract of education; further record development would be permitted on the issue of whether claim could be litigated without offending First Amendment). Plaintiff contends that, even if her Title VII claims are barred by the exception, her common law claims should not be. But our review of Plaintiff's allegations convinces us that the exception must apply to all of her claims.

Plaintiff's breach of contract claim, for example, is premised upon the assertion that the "essential terms" of her contract—i.e., that Plaintiff, as Chaplain, would serve on the President's staff and lead the Chaplain's Division—were breached when Garibaldi removed her from the President's Staff and placed her division under the leadership of Rouch as Vice President for Mission and Ministry. (FAC ¶¶ 90–91.) Plaintiff alleges she was damaged by this breach "in that she was, in fact, removed from her position of leadership based upon her gender rather than her job performance," which resulted in her constructive discharge. (FAC ¶ 92.) Thus, inherent in Plaintiff's contract claim is the theory that Gannon fired her, not because of the manner in which she performed her ministerial functions, but because of her gender. Resolution of these issues would necessarily lead us into an examination of Gannon's motives for the alleged termination of Plaintiff, a ministerial employee. Moreover, evaluation of whether Plaintiff was subjected to a *de facto* demotion during her tenure as Chaplain and/or whether she was constructively discharged would likely devolve into inquiries about Gannon's decisions relative to the structuring of assignments among its ministerial employees. These are matters touching too closely upon the church-minister employment relationship and, consequently, we conclude that the First Amendment bars our adjudication of Plaintiff's contract claim as it has been pled. As the *McKelvey* Court recognized: "where an ecclesiastically-based action clearly is present, such as the propriety of a church's *choice* concerning the hiring, termination, relocation, benefits, or tenure of a person whose function ... concerns the propagation of its faith, the First Amendment shields the religious organization from suit." 800 A.3d at 858 (emphasis in the original). We find that to be the case here.

Plaintiff's remaining state law claims suffer from similar deficiencies. Plaintiff's civil conspiracy claim is premised upon her allegation that the Defendants unlawfully conspired to violate Title VII, and, like the gender discrimination and retaliation claims themselves, it implicates First Amendment concerns about the University's unfettered right to make employment decisions relative to its ministerial employees. Plaintiff's fraudulent misrepresentation and "negligent retention" claims

are premised upon the central allegation that Trautman and the other individual Defendants oppressed Plaintiff's civil rights, despite having promised to make employment decisions based upon her job performance. Adjudication of these claims would necessarily involve an inquiry into the University's subjective evaluation of Plaintiff's performance as Chaplain and/or the University's reasons for its challenged employment decisions In short, we would of necessity have to inquire into Gannon's decisions regarding its own internal management of its ministers. Yet "civil court review of ecclesiastical decisions of church tribunals, particularly those pertaining to the hiring or firing of clergy, are *in themselves* an 'extensive inquiry' into religious law and practice, and hence forbidden by the First Amendment." *Young v. Northern Illinois Conference of United Methodist Church*, 21 F.3d 184, 187 (7th Cir.1994) (interpreting *Serbian Eastern Orthodox Diocese v. Milivojevich*, 426 U.S. 696, 96 S.Ct. 2372, 49 L.Ed.2d 151 (1976)) (emphasis in original).

Our conclusion that the ministerial exception bars these claims is in accordance with the holdings of other federal courts faced with similar claims. *See, e.g., Lewis v. Seventh Day Adventists Lake Region Conference*, 978 F.2d 940 (6th Cir.1992) (First Amendment barred review of minister's claims for breach of contract, promissory estoppel, intentional infliction of emotional distress, and loss of consortium arising out of his termination); *Natal v. Christian and Missionary Alliance*, 878 F.2d 1575 (1st Cir.1989) (court would not review clergyman's claim of wrongful termination); *Kraft v. The Rector, Churchwardens and Vestry of Grace Church in New York*, No. 01–CV–7871 (KMW), 2004 WL 540327 (S.D.N.Y. Mar.17, 2004) (former priest's claims for breach of employment contract, tortious interference with employment contract, wrongful discharge,

and defamation barred by Free Exercise Clause); *Jacobs v. Mallard Creek Presbyterian Church, Inc.*, 214 F.Supp.2d 552 (W.D.N.C.2002) (pastor's breach of contract claim arising from church's investigation of alleged sexual misconduct were barred by First Amendment). *See also Werft*, 377 F.3d at 1100 n. 1 (declining to distinguish between federal and state law claims in application of ministerial exception; "Just as there is a ministerial exception to Title VII, there must also be one to any federal or state cause of action that would otherwise impinge on the Church's prerogative to choose its ministers.") (citation omitted).

Finally, we acknowledge Plaintiff's concerns that discrimination, in any form, should not be tolerated in civilized society. Plaintiff passionately argues that:

> [t]olerance of gender-based discrimination in the work place has led to sexual exploitation and harassment, which turns women into objects. To allow these behaviors to go unregulated simply because they [sic] employer is a religious entity and the employee is claimed to be a minister is unjustified and perpetuates the very evils Congress sought to eliminate. It is hard to argue that certain conduct is even wrong when churches freely engage in it. This has a tremendous impact on establishing social norms....

(Pl.'s Amended Br. in Opp. to All Def.s' Mot. to Dismiss [Doc. No. 58] at p. 17.)

█ In rendering this decision, this Court, like others, is "mindful of the potential for abuse" which application of the ministerial exception can invite, "namely, the use of the First Amendment as a pretextual shield to protect otherwise prohibited employment decisions." *Scharon*, 929 F.2d at 363 n. 3. But it bears reiterating that the ministerial exception, though

"robust where it applies," *Roman Catholic Diocese*, 213 F.3d at 801, is not without limits and therefore "does not insulate wholesale the religious employer from the operation of federal anti-discrimination statutes." *Id.* For one, the exception does not apply to employment decisions concerning individuals with purely custodial or administrative functions. *Id.* It has also been found inapplicable in the context of Title VII sexual harassment claims. *See Bollard*, 196 F.3d at 948–50 (holding that former novice could pursue sexual harassment claim against Jesuit Order where defendant was neither exercising its constitutionally protected prerogative to choose its ministers nor embracing the behavior at issue as a protected religious practice).[5] The "saving grace," as one court has noted, "lies in the recognition that courts consistently have subjected the personnel decisions of various religious organizations to statutory scrutiny where the duties of the employees were not of a religious nature." *Scharon, supra*, at 363 n. 3 (citing cases). Moreover,

> the existence of the ministerial exception does not derogate the profound state interest in "assuring equal employment opportunities for all, regardless of race, sex, or national origin." ... Rather, the exception simply recognizes that the "introduction of government standards to the selection of spiritual leaders would significantly, and perniciously, rearrange the relationship between church and state.'" ... Application of the exception thus manifests no more than the reality that a constitutional command

cannot yield to even the noblest and most exigent of statutory mandates.

*Roman Catholic Diocese of Raleigh*, 213 F.3d at 801 (internal citations omitted).

## IV. CONCLUSION

Based upon the foregoing reasons, the Court will grant the Defendants' motions to dismiss this case for lack of subject matter jurisdiction. An appropriate order follows.

## ORDER

AND NOW, this _____ day of _____, _____, for the reasons set forth in the accompanying Memorandum Opinion,

IT IS HEREBY ORDERED that Defendants' Motions [Doc. Nos. 50 and 52] to Dismiss the First Amended Complaint are hereby GRANTED and the claims set forth in Plaintiff's First Amended Complaint are dismissed with prejudice. The Clerk is directed to mark this case "closed."

---

5. We note that while Plaintiff accuses Defendant Rubino of sexually harassing other third parties, she does not claim to have personally suffered any sexual harassment at his hands. Nothing in this opinion necessarily limits the right of a victim of sexual harassment to pursue a Title VII claim against a religious entity. However, Plaintiff's status as an alleged whistleblower does not defeat application of the ministerial exception. *See, e.g., Gellington*, 203 F.3d at 1304 (First Amendment barred minister's Title VII claim premised upon alleged retaliation for his assistance of another employee in pursuing her sexual harassment claim).